OPINION OF THE COURT
Chief Judge Cooke.
We hold that a manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiffs injuries.
Plaintiff Gerald Robinson, then 17, was employed as a plastic molding machine operator by third-party defendant Plastic Jewel Parts Co. A recent arrival to New York from *476 South Carolina where he had been an itinerant farm worker, Robinson had been employed by Plastic Jewel for approximately three weeks. On October 15, 1971, plaintiff suffered severe injuries when his hand was caught between the molds of a plastic molding machine manufactured by defendant Reed-Prentice and sold to Plastic Jewel in 1965, some six and one-half years prior to the accident.
Plaintiff commenced this action against Reed-Prentice which impleaded third-party defendant Plastic Jewel. At the close of proof, causes of action in strict products liability and negligence in the design and manufacture of the machine were submitted to the jury. A sizeable general verdict was returned in favor of plaintiff, the jury apportioning 40% of the liability against Reed-Prentice, the remainder against Plastic Jewel. On appeal, the Appellate Division reversed and ordered a new trial limited to the issue of damages unless plaintiff stipulated to a reduced verdict. Plaintiff so stipulated and the judgment, as amended and reduced, was affirmed. This court then granted Reed-Prentice and Plastic Jewel leave to appeal (CPLR 5602, subd [a], par 1, cl [ii]). We now reverse.
The plastic injection molding machine is designed to melt pelletized plastic inside a heating chamber. From the heating chamber, the liquefied plastic is forced into the mold area by means of a plunger. The mold area itself is composed of two rectangular platens on which the plastic molds are attached. One of the platens moves horizontally to open and close the mold; the other remains stationary. When the operating cycle is begun, hydraulic pressure causes the movable platen to be brought up against the stationary platen, thus forming a completed mold into which the heated plastic is pumped. After the plastic is cured, the movable platen returns to its original position, thereby permitting the operator to manually remove the finished product from its mold.
To protect the operator from the mold area, Reed-Prentice equipped the machine with a safety gate mounted on rollers and connecting interlocks in conformity with the State Industrial Code (12 NYCRR 19.34). Completely covering the mold area, the metal safety gate contained a Plexiglas window allowing the operator to monitor the molding process. Since the gate shielded the mold area, access to the platens was impossible while the machine was operating. Only when the molding sequence was completed could the operator roll the safety gate to the open position, allowing him to reach into *477 the mold area to remove the finished product. The interlocks were connected to electrical switches which activated the hydraulic pump. When the safety gate was closed, the interlocks complete a circuit that activates the hydraulic pump, thereby causing the movable platen to close upon its stationary counterpart. When the safety gate was opened, however, this essential circuit would not be completed and hence the machine would not be activated.
After the machine was delivered by Reed-Prentice, Plastic Jewel discovered that its design did not comport with its production requirements. Plastic Jewel purchased the machine in order to mold beads directly onto a nylon cord. The cord was stored in spools at the back of the machine and fed through the mold where the beads were molded around it. After each molding cycle, the beads were pulled out of the mold and the nylon cord was reset in the mold for the next cycle. To allow the beads to be molded on a continuous line, Plastic Jewel determined that it was necessary to cut a hole of approximately 6 by 14 inches in the Plexiglas portion of the safety gate. The machine, as designed, contracted for and delivered, made no provision for such an aperture. At the end of each cycle, the now corded beads would be pulled through the opening in the gate, the nylon cord would be restrung, and the next cycle would be started by opening and then closing the safety gate without breaking the continuous line of beads. While modification of the safety gate served Plastic Jewel’s production needs, it also destroyed the practical utility of the safety features incorporated into the design of the machine for it permitted access into the molding area while the interlocking circuits were completed. Although the record is unclear on this point, plaintiff’s hand somehow went through the opening cut into the safety gate and was drawn into the molding area while the interlocks were engaged. The machine went through the molding cycle, causing plaintiff serious injury.
The record contains evidence that Reed-Prentice knew, or should have known, the particular safety gate designed for the machine made it impossible to manufacture beads on strings. During the period immediately prior to the purchase of the machine, Reed-Prentice representatives visited the Plastic Jewel plant and observed two identical machines with holes cut in the Plexiglas portion of their safety gates. At that meeting, Plastic Jewel’s plant manager discussed the problem with a Reed-Prentice salesman and asked whether a safety *478 gate compatible with its product needs could be designed. Moreover, a letter sent by Reed-Prentice to Plastic Jewel establishes that the manufacturer knew precisely what its customer was doing to the safety gate and refused to modify its design. However, the letter pointed out that the purchaser had "completely flaunted the safeties built into this machine by removing part of the safety window”, and that it had not "held up your end of the purchase when you use the machine differently from its design” and the manufacturer stated "[a]s concerns changes, we will make none in our safety setup or design of safety gates”. At trial, plaintiffs expert indicated that there were two modifications to the safety gate which could have been made that would have made it possible to mold beads on a string without rendering the machine unreasonably dangerous. Neither of these modifications were made, or even contemplated, by Reed-Prentice.
Defendants maintain that a manufacturer may not be held to answer in damages where the purchaser of its product deliberately destroys the functional utility of that product’s safety features and, as a result of that intentional act, a third party is injured. Once a product which is not defective is injected into the stream of commerce, they argue, the responsibility of the manufacturer is at an end. Thus, having delivered to Plastic Jewel a plastic injection molding machine which was free from defect and in conformity with State promulgated safety regulations, Reed-Prentice fully discharged any legal duty it may have owed to Plastic Jewel and its employees. Plaintiff asserts that a manufacturer’s duty is tempered by principles of foreseeability. Thus, if a manufacturer knows or has reason to know that its product would be used in an unreasonably dangerous manner, for example by cutting a hole in a legally required safety guard, it may not evade responsibility by simply maintaining that the product was safe at the time of sale.
A cause of action in strict products liability lies where a manufacturer places on the market a product which has a defect that causes injury (Codling v Paglia, 32 NY2d 330, 342). As the law has developed thus far, a defect in a product may consist of one of three elements: mistake in manufacturing (Victorson v Bock Laundry Mach. Co., 37 NY2d 395; Codling v Paglia, supra), improper design (Micallef v Miehle Co., Div. of Miehle-Goss Dexter, 39 NY2d 376; Bolm v Triumph Corp., 33 NY2d 151), or by the inadequacy or absence of warnings for *479 the use of the product (Torrogrossa v Towmotor Co., 44 NY2d 709). Plaintiff maintains that the safety gate of the molding machine was improperly designed for its intended purpose.
Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed. This rule, however, is tempered by the realization that some products, for example knives, must by their very nature be dangerous in order to be functional. Thus, a defectively designed product is one which, at the time it leaves the seller’s hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce (Restatement, Torts 2d, § 402A). Design defects, then, unlike manufacturing defects, involve products made in the precise manner intended by the manufacturer (2 Frumer & Friedman, Products Liability, § 16A [4] [f] [iv]). Since no product may be completely accident proof, the ultimate question in determining whether an article is defectively designed involves a balancing of the likelihood of harm against the burden of taking precaution against that harm (Micallef v Miehle Co., supra, p 386; 2 Harper and James, Torts, § 28.4).
But no manufacturer may be automatically held liable for all accidents caused or occasioned by the use of its product (see Wade, A Conspectus of Manufacturers’ Liability for Products, 10 Ind L Rev 755, 768). While the manufacturer is under a nondelegable duty to design and produce a product that is not defective, that responsibility is gauged as of the time the product leaves the manufacturer’s hands (Restatement, Torts 2d, § 402A, Comments g, p; Hanlon v Cyril Bath Co., 541 F2d 343, 345; Santiago v Package Mach. Co., 123 111 App 2d 305, 312; Temple v Wean United, 50 Ohio St 2d 317, 322-323). Substantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer (Keet v Service Mach. Co., 472 F2d 138, 140; Hardy v Hull Corp., 446 F2d 34, 35-36; Coleman v Verson Allsteel Press Co., 64 111 App 3d 974; Ariz Rev Stat Ann, § 12-683, subd 2; RI Gen Laws, § 9-1-32; Proposed Uniform Product Liability Act, § 112, subd [D], 44 Fed Reg 62737).
At the time Reed-Prentice sold the molding machine, it was not defective. Had the machine been left intact, the safety *480 gate and connecting interlocks would have rendered this tragic industrial accident an impossibility. On closer analysis, then, plaintiff does not seek to premise liability on any defect in the design or manufacture of the machine but on the independent, and presumably foreseeable, act of Plastic Jewel in destroying the functional utility of the safety gate. Principles of foreseeability, however, are inapposite where a third party affirmatively abuses a product by consciously bypassing built-in safety features. While it may be foreseeable that an employer will abuse a product to meet its own self-imposed production needs, responsibility for that willful choice may not fall on the manufacturer. Absent any showing that there was some defect in the design of the safety gate at the time the machine left the practical control of Reed-Prentice (and there has been none here), Reed-Prentice may not be cast in damages for strict products liability.
Nor does the record disclose any basis for a finding of negligence on the part of Reed-Prentice in the design of the machine. Well settled it is that a manufacturer is under a duty to use reasonable care in designing his product when "used in the manner for which the product was intended * * * as well as an unintended yet reasonably foreseeable use” (Micallef v Miehle, supra, pp 385-386). Many products may safely and reasonably be used for purposes other than the one for which they were specifically designed. For example, the manufacturer of a screwdriver must foresee that a consumer will use his product to pry open the lid of a can and is thus under a corresponding duty to design the shank of the product with sufficient strength to accomplish that task. In such a situation, the manufacturer is in a superior position to anticipate the reasonable use to which his product may be put and is obliged to assure that no harm will befall those who use the product in such a manner. It is the manufacturer who must bear the responsibility if its purposeful design choice presents an unreasonable danger to users. A cause of action in negligence will lie where it can be shown that a manufacturer was responsible for a defect that caused injury, and that the manufacturer could have foreseen the injury. Control of the instrumentality at the time of the accident in such a case is irrelevant since the defect arose while the product was in the possession of the manufacturer.
 The manufacturer’s duty, however, does not extend to designing a product that is impossible to abuse or one whose *481 safety features may not be circumvented. A manufacturer need not incorporate safety features into its product so as to guarantee that no harm will come to every user no matter how careless or even reckless (cf. Aetna Ins. Co. v Loveland Gas & Elec. Co., 369 F2d 648; Drazen v Otis Elevator Co., 96 RI 114). Nor must he trace his product through every link in the chain of distribution to insure that users will not adapt the product to suit their own unique purposes. The duty of a manufacturer, therefore, is not an open-ended one. It extends to the design and manufacture of a finished product which is safe at the time of sale. Material alterations at the hands of a third party which work a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature, however foreseeable that modification may have been, are not within the ambit of a manufacturer’s responsibility. Acceptance of plaintiff’s concept of duty would expand the scope of a manufacturer’s duty beyond all reasonable bounds and would be tantamount to imposing absolute liability on manufacturers for all product-related injuries (see Henderson, Judicial Review of Manufacturers’ Conscious Design Choices: The Limits of Adjudication, 73 Col L Rev 1531).
Unfortunately, as this case bears out, it may often be that an injured party, because of the exclusivity of workers’ compensation, is barred from commencing an action against the one who exposes him to unreasonable peril by affirmatively rendering a safe product dangerous. However, that an employee may have no remedy in tort against his employer gives the courts no license to thrust upon a third-party manufacturer a duty to insure that its product will not be abused or that its safety features will be callously altered by a purchaser (cf. McLaughlin v Mine Safety Appliances Co., 11 NY2d 62, 71-72). Where the product is marketed in a condition safe for the purposes for which it is intended or could reasonably be intended, the manufacturer has satisfied its duty.
Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be reversed, with costs, and the complaint and third-party complaint dismissed.