YESSENIA LUGO, an Infant, by Her Mother and Natural Guardian, MILDRED LOPEZ, et al., Respondents, v LJN TOYS, LTD., Appellant.

First Department, April 13, 1989

■■■■■

## APPEARANCES OF COUNSEL

*Robert C. Agee* of counsel *(Fitzgerald & Fitzgerald,* attorneys), for respondents.

*Joseph M. Buderwitz* of counsel *(Joseph J. Buderwitz, Jr.,* with him on the brief; *Anthony J. Caputo, P. C.,* attorney), for appellant.

## OPINION OF THE COURT

KASSAL, J.

■ Under the venerable and oft-reiterated standard by which a motion for summary judgment must be determined, the court's function is one of issue finding rather than issue determination, and if there is any doubt as to the existence of factual issues, this "drastic remedy" should not be granted. *(Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404.) Bearing these principles in mind, we have examined the record before us and conclude that the circumstances presented do raise material issues of fact, and that this matter must accordingly await resolution at trial.

On March 21, 1986, the infant plaintiff, six-year-old Yessenia Lugo, sustained serious and permanent eye injuries when a detachable part of a toy, flung in her direction by an eight-year-old neighbor, Brian Franks, struck her left eye. The toy, which was manufactured and distributed by defendant, LJN Toys, Ltd. (LJN), was "Voltron—Defender of the Universe", a robot-like plastic figure marketed for children four years of age and older. Its packaging contained neither warnings nor directions for recommended use of the figure or its various detachable parts.

Children who watched television, however, were likely to be familiar with the Voltron animated cartoon series, whose popularity inspired the creation of the toy. These cartoons, which were a favorite television program of Brian's, were also available in video cassettes. In them, Voltron, the powerful Defender of the Universe, fought enemies with his sword and "spinning laser blade", a star-shaped weapon with eight sharp points. The cartoons depicted Voltron calling upon the spinning blade, which would appear in his hand, and then spinning it toward his opponent, who would be sliced or cut upon

contact. In one instance, the spinning blade trimmed the ears off of Voltron's enemy. It was this weapon, designed to detach from the hand of the Voltron toy, that Brian threw, causing Yessenia's injuries.

Upon this record, LJN asserts that it is entitled to summary judgment dismissing the complaint as a matter of law. We are in agreement with the trial court that this motion must be denied.

The Court of Appeals has consistently instructed that, "[n]egligence cases by their very nature do not usually lend themselves to summary judgment" *(Ugarriza v Schmieder,* 46 NY2d 471, 474), for "even when the facts are conceded there is often a question as to whether the defendant or the plaintiff acted reasonably under the circumstances [, an issue which] can rarely be decided as a matter of law". *(Andre v Pomeroy,* 35 NY2d 361, 364.)* Questions of design defect, such as those raised here, have specifically been held to be inappropriate for summary judgment relief. *(Bolm v Triumph Corp.,* 33 NY2d 151.)* Likewise, where the claim of liability is based upon a manufacturer's failure to warn, a theory also presented by plaintiffs herein, summary judgment will generally not lie. *(Cooley v Carter-Wallace, Inc.,* 102 AD2d 642; *see, Cover v Cohen,* 61 NY2d 261.)*

Of course, while the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law *(Winegrad v New York Univ. Med. Center,* 64 NY2d 851, 853), the opponent of such a motion must establish the existence of a genuine factual controversy. *(Capelin Assocs. v Globe Mfg. Corp.,* 34 NY2d 338, 341.)* In the case at bar, plaintiffs have met this burden through the submission of affidavits from experts, one of whom is a member of the Toy Safety Task Group of the American Society of Testing and Materials. Plaintiffs' experts assert that the television shows and video cassettes depicting Voltron's use of the spinning blade as an offensive weapon could influence a child, consciously or unconsciously, to emulate such behavior. These experts have also expressed the view that the design of the toy, which permitted the spinning blade to be readily detached from Voltron's hand—indeed, such detachability was intended—posed unreasonable risks and dangers to the children for which it was marketed.

Despite this evidence, as well as the concession by defendant's own witness that the spinning blade was a "throwing

star" which is "thrown and sticks in things", defendant claims, and has persuaded our dissenting colleagues, that plaintiffs have failed to raise questions of fact sufficient to overcome a motion for summary judgment. Because defendant's arguments reach beyond issue finding and engage in the prohibited practice of "issue determination", we reject them for the purposes of accelerated judgment, and relegate this controversy to the proper forum, the jury. It is defendant's contention, for example, that the Voltron toy's compliance with certain Federal toy safety regulations absolves it, as a matter of law, from any liability. It is well established in this State, however, that while compliance with a statute may constitute some evidence of due care, it does not preclude a finding of negligence. *(Sherman v Lowenstein & Sons,* 28 AD2d 922; *Stone v Sterling Drug,* 111 AD2d 1017.)

Defendant further invokes the doctrine of "obvious risk" to negate any liability on its part as a matter of law, citing various out-of-State authorities to support this claim. Under New York law, however, the extent to which a risk may be deemed to have been obvious is simply another factor in determining the degree of reasonable care exercised by the parties and, as such, must be reserved for the trier of the facts. *(See, Micallef v Miehle Co.,* 39 NY2d 376, 387.)

In short, this case is not one in which summary judgment, a drastic remedy that is the procedural equivalent of a trial *(Capelin Assocs. v Globe Mfg. Corp., supra,* at 341), should be granted. As this court recently observed in *Rotz v City of New York* (143 AD2d 301, 304) "Issues of negligence, foreseeability and proximate cause involve the kinds of judgmental variables which have traditionally, and soundly, been left to the finders of fact to resolve even where the facts are essentially undisputed".

■ Although we have concluded that defendant is not entitled to summary judgment, our examination of this record leads us to agree with defendant that plaintiffs' claim for punitive damages should have been stricken. The recovery of such damages "depends upon the defendant acting with evil or wrongful motive or with a willful and intentional misdoing, or with a reckless indifference equivalent thereto". *(Le Mistral v Columbia Broadcasting Sys.,* 61 AD2d 491, 495, *appeal dismissed* 46 NY2d 940.) This standard is not met here.

For the foregoing reasons, the order, Supreme Court, Bronx County (Jack Turret, J.), entered on or about December 24,

1987, should be modified, on the law, to the extent of striking the third cause of action in the complaint, and otherwise affirmed, without costs.

SULLIVAN, J. (dissenting). Defendant LJN Toys, Ltd., a toy manufacturer, appeals from the denial of its motion for a summary judgment dismissal of the complaint in this products liability action seeking to hold it liable for the act of an 8½-year-old boy who threw a part of its toy, which struck the then six-year-old infant plaintiff in the eye. Since plaintiffs, the infant and her mother, who sues in her derivative right as well as representative capacity, have failed to demonstrate that the toy was defective or unreasonably dangerous for its intended use, we would reverse and dismiss the complaint.

The complaint alleges that Yessenia Lugo was severely injured after being struck in the eye by the plastic shield of a Voltron doll manufactured by defendant. It is alleged that the plastic was designed and manufactured negligently and in violation of Federal "sharp point" requirements, and that, despite defendant's representation that the toy was safe for children four years of age and over, inadequate warnings left infants, and presumably parents, unadvised as to the extreme danger from the claimed foreseeable use of this unreasonably dangerous toy.

These general allegations are amplified by the bill of particulars which states, in part, that the doll was designed and manufactured with a laser star pointed shield with sharp edges, and that it was foreseeable that the shield would be used in the manner depicted in the video program known as Voltron, the Defender of the Universe, in which the shield is depicted as being a spinning laser that flies from Voltron to his adversaries. Plaintiffs further allege that the laser shield did not meet the Consumer Products Safety Commission's standards, that defendant knew or should have known of the dangerous propensities of the spinning laser, and that it was foreseeable that, in the hands of minor children, it "would cause the same destruction as in the hands of Voltron, the Defender of the Universe". Thus, plaintiffs' theory is grounded upon the premise that, foreseeably, children would watch the Voltron video program and imitate the cartoon character's use of its shield by throwing it in a like manner.

Brian Franks, the boy who threw the shield, testified, under oath, at his examination before trial that he was playing in the basement of the apartment building where his and plain-

tiffs' families lived. The infant plaintiff and Brian's four-year-old brother, John, were playing together nearby. Brian was not playing with the other two, but was instead engaged in throwing the small Voltron shield against various parts of the basement wall. He threw the shield a few times, moving each time to a different location after retrieving it. Eventually, he positioned himself so that the two younger children were seated on the floor between him and the wall. As Brian again threw the shield, the infant plaintiff, who was only five feet away, stood and turned into its path, and the shield struck her on the edge of her left eye.

Brian testified, unequivocally, that he was not playing Voltron at the time, or trying to imitate Voltron; nor was he throwing the toy shield as a result of previously watching a Voltron video program or cartoon. His parents testified that all four of their sons were instructed against throwing objects at or near other people.

The toy in question was marketed pursuant to a license agreement into which defendant entered with Koplar Enterprises, Inc., allowing it to manufacture and sell a Voltron line of products. The dolls were designed and manufactured in the Far East. In May and July of 1985, before ever being placed on the market in the United States, the toy and all its parts were examined and tested by Labtest, Ltd., for compliance with United States Voluntary Product Standard PS 72-76 as to flammability, as well as mechanical and physical characteristics. The toy passed inspection, which included testing for material quality, sharp edge, sharp point, impact, torque, tension and compression.

The toy is completely inanimate. Neither the doll nor any of its parts are mechanically or electrically movable or projectable. Nor is there any dispute that the doll and its parts do not meet the definition of a projectile as set forth by Standard F963-86 of the American Society for Testing and Materials: "[a]n object propelled by means of a discharge mechanism capable of storing and releasing energy under the control of the operator."

In further support of its position that the toy and its parts were not defective and met all safety requirements, defendant also submitted the independent test results of Acts Testing Labs, dated February 12, 1987, which demonstrate complete compliance with the applicable toy safety requirements. Defendant's expert, a former member of the National Commis-

sion on Product Safety and holder of various management positions with the Consumer Products Safety Commission, including Program Manager for children's products, completely supported the test reports, verifying that the toy was not a projectile, and was not violative of Federal sharp point or sharp edge requirements. Plaintiff's expert, a specialist in motor development of young children, did not claim that the toy or its parts violated these standards but, rather, that the "Toy Safety Community" had standards that went beyond these requirements. This expert did not, however, set forth or explain these standards, which do not appear anywhere in this record.

To succeed in their claim, plaintiffs must demonstrate that at the time of marketing the doll was either defective or unreasonably dangerous for its intended use. *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471; *see, Voss v Black & Decker Mfg. Co.,* 59 NY2d 102; *Codling v Paglia,* 32 NY2d 330, 342.)* They must show that the toy is a product, which, "at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce". *(Robinson v Reed-Prentice Div. of Package Mach. Co., supra,* at 479, citing Restatement [Second] of Torts § 402 A.) Absent from this record is any proof whatsoever that the doll and/or its shield were defective or unreasonably dangerous by being violative of Federal sharp point or sharp edge requirements. Noteworthy in this regard is that after first alleging, *inter alia,* that the doll had sharp edges and points in violation of the regulations promulgated under the Federal Hazardous Substances Act (16 CFR 1500.48, 1500.49), plaintiffs abandoned this theory once confronted with the proof that the toy did not violate the regulations. Plaintiffs then retreated to the unsupported theory that the intended use of the toy was for a child to throw it, or its parts.

Unable to rebut defendant's showing that Federal sharp point and edge tests revealed no defect whatsoever, plaintiffs conveniently ignored this proof by attempting to explain it away. Their expert relied on the "Toy Safety Community", and that undefined community's unspecified, unlisted and unproven "standards" of which, allegedly, the Voltron toy's shield was in violation. Without knowing what the relevant standard is, no manufacturer can design a product in conform-

ity with it, or warn the consumer of any latent defect. Without some indication as to what the "Toy Safety Community" standards are, if any, an expert is free to conclude anything about a product's design or capabilities. Such "opinion", however, is neither competent nor probative evidence, since an expert's opinion must be based on a proper factual foundation. (Sawyer v Dreis & Krump Mfg. Co., 67 NY2d 328; Matter of Aetna Cas. & Sur. Co. v Barile, 86 AD2d 362.)

Equally meritless is the claim of plaintiffs' expert that the shield is a projectile because a child can throw it by hand. Defendant has demonstrated quite clearly that the toy is completely inanimate and does not, in any way, approach the definition of projectile as defined by Standard F963-86 of the American Society for Testing and Materials. Plaintiffs' expert conveniently ignores the requirement of a discharge mechanism with the capability of storing and releasing energy.

Nor is the doll dangerous when put to its normal or intended use. As the facts here demonstrate, the toy was without sharp points or edges as defined by 16 CFR 1500.48 and 1500.49; it is not a projectile; it was designed and intended to be taken apart and assembled by children; and its normal, intended use did not include the act of a child throwing it or its parts at a wall, a floor, or even a person.* To require a manufacturer to design its toy against such use, or to warn against its toy being thrown, is to cast the manufacturer in the role of an insurer answerable for all injuries which may arise from the use or misuse of its product. The law does not impose such a duty. (See, Biss v Tenneco, Inc., 64 AD2d 204, 207-208; Landrine v Mego Corp., 95 AD2d 759, 760.)

A toy does not become a dangerous product merely because an injury is inflicted by its use. Nor, absent a defect, may a manufacturer be cast in liability merely because children abuse its product. As an overwhelming number of cases have held, the act of throwing a toy in the course of play is a risk too obvious to be the manufacturer's responsibility against which to warn. (See, e.g., First Natl. Bank v Regent Sports Corp., 619 F Supp 820 [court, applying Illinois law, found that manufacturer did not owe a duty to warn where eight-year-old child threw a lawn dart which lodged in skull of toddler];

---

* The record discloses that the normal or intended use of the Voltron Assembler doll was for a child to take it apart, put it back together and to use it in conjunction with other doll-type toys. Even Brian Franks admitted that this was how the toy was supposed to be used.

*Atkins v Arlans Dept. Store,* 522 P2d 1020 [Okla] [manufacturer of lawn darts not liable for injury caused by child throwing dart which hit another child]; *Pitts v Basile,* 35 Ill 2d 49, 219 NE2d 472 [act of eight year old in throwing dart which struck six year old in eye was obvious danger against which retailer and remote vendor did not have a duty to warn]; *Venezia v Miller Brewing Co.,* 626 F2d 188 [manufacturer did not owe a duty to warn where eight-year-old child threw a bottle against a pole, shattering it and severely injuring his eye; propensity of bottle to break and potential injury therefrom a matter of common knowledge]; *Geary v Hood & Sons,* 336 Mass 369, 145 NE2d 716 [eye injury to seven-year-old boy not the fault of milk company employee who left, in conspicuous place, ice, which children used to throw]; *Maramba v Neuman,* 82 Ill App 2d 95, 227 NE2d 80 [retailer of boomerang not liable for injuries self-inflicted by inexperienced 10-year-old child]; *see also, Strahlendorf v Walgreen Co.,* 16 Wis 2d 421, 114 NW2d 823 [improper use of toy airplane launched from only five feet away was cause of plaintiff's injuries, not any defect in the toy plane itself].) Thus, when the risk of misuse is obvious or known, a warning is unnecessary and liability does not attach to the manufacturer as a result of said use. *(Larsen v General Motors Corp.,* 391 F2d 495.) To hold otherwise would subject toy manufacturers to unforeseen and incalculable levels of exposure.

As the record demonstrates, Brian Franks, a Little League pitcher, was well aware of how to throw objects, under which circumstances objects could be properly thrown in play, how this Voltron doll was intended to be played with and the dangers of throwing any object at or near other people. His testimony clearly shows that when he hurled the shield toward the wall for the third time and struck the infant plaintiff he was not emulating the Voltron cartoons he had seen. The record supports no other conclusion but that he abused defendant's toy by using it in a way never intended.

To circumvent the unequivocal sworn testimony on this point, plaintiffs have attempted to introduce, in violation of CPLR 5526 and 5528, a statement of Brian's mother, never submitted to the motion court, to the effect that Brian told her that he was throwing the shield because he had seen Voltron do the same on television. Even if this improperly appended statement were to be considered, it does not raise an issue of fact in this regard, since it constitutes rank hearsay.

*(See, Eddy v Tops Friendly Mkts.,* 91 AD2d 1203, *affd* 59 NY2d 692.) To defeat summary judgment, a party must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact. *(Zuckerman v City of New York,* 49 NY2d 557, 562.) The existence of a factual issue cannot be established on the hearsay information of one without personal knowledge of the facts. *(Supra.)*

Likewise, plaintiffs cannot impeach Brian's clear factual testimony that he was not emulating Voltron when he threw the toy shield by a psychologist's interpretation that he really meant the opposite of what he said. This impeachment tactic is unavailing, and fails to raise an issue of fact since an expert's testimony may not properly be received to express an opinion as to the significance of a witness's testimony. *(See, Kulak v Nationwide Mut. Ins. Co.,* 40 NY2d 140, 147.) Such opinion testimony trespasses on the fact finder's domain.

In any event, even if plaintiffs' theory of liability and foreseeability could be factually supported and were upheld, its logical conclusion would hold the manufacturer of a Spider-man costume liable for the injury inflicted by a misguided child who, emulating the cartoon, unsuccessfully tried to scale a building. So, too, a child's conduct in throwing a toy match-box car and injuring another because he was imitating Super-man, the comic book hero, would cast the toy car manufac-turer in liability. Such an unreasonable extension of liability is not only illogical, it does not serve any worthwhile public policy. As already noted, however, the uncontroverted facts here demonstrate that the Voltron cartoons did not play any part in the accident.

Accordingly we would reverse, grant summary judgment and dismiss the complaint.

KUPFERMAN, J. P., and ASCH, JJ., concur with KASSAL, J.; SULLIVAN and CARRO, JJ., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, Bronx County, entered on or about December 24, 1987, modified, on the law, to the extent of striking the third cause of action in the complaint and other-wise affirmed, without costs and without disbursements. The motion by appellant to strike the improperly submitted Appen-dix is granted.