Titone, J.
(dissenting in part and concurring in part). The majority holds that the pool manufacturer in this case cannot be held liable, but the precise basis for its holding is unclear. At one point, the majority suggests that the pool’s in-ground installation constituted a "substantial alteration or modification” of the product by a third party, insulating the manufacturer from liability, even if the product change was known or foreseeable (see, Robinson v Reed-Prentice Div., 49 NY2d 471). In the very next paragraph, however, the majority appears to shift ground and, after identifying the problem as one of product misuse, seems to base its holding on the absence of proof that defendant Seaspray Sharkline, Inc. (Seaspray), the manufacturer, knew or should have known that in-ground installation of above-ground pools was a common practice. Neither rationale withstands close analysis. Accordingly, I dissent from the majority’s decision to dismiss the action against Seaspray.[1]
Plaintiff Vincent Amatulli was seriously injured when he *536 dove into a shallow backyard swimming pool owned by the Susis. The present suit, which included a claim against the pool’s manufacturer, was based on the theory that the aqua color of the pool liner, coupled with the fact that the pool had been sunken into the ground and encircled by a deck, created the illusion that the pool’s center was deep enough for diving. This theory was supported by an expert’s affidavit, which also faulted the pool manufacturer for not providing depth markings or adequate warnings against diving.
Initially, to the extent that the majority has rejected plaintiffs’ theory on the basis of the rule articulated in Robinson v Reed-Prentice Div. (supra), its reliance is misplaced. In Robinson, the purchaser of a plastic molding machine had deliberately removed a safety gate installed by the product’s manufacturer to protect operators from injury. Although there was proof that the manufacturer knew or had reason to know that the purchaser intended to modify the machine in this manner, the Court rejected an injured worker’s claims based on strict products liability and design defect theories, holding that "[substantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer” (49 NY2d, at 479). However, the Court also reaffirmed its commitment to the ’’[w]ell-settled” principle that "a manufacturer is under a duty to use reasonable care in designing [its] product when ’used in the manner for which the product was intended * * * as well as an unintended yet reasonably foreseeable use’ ” (id., at 480, quoting Micallef v Miehle Co., 39 NY2d 376, 385-386).
There thus exists a clear distinction between ’’substantial alteration” cases and cases involving unintended uses, or misuses, of a manufacturer’s product. Moreover, the distinction is one that should not be blurred or overlooked, since it determines whether an injured plaintiff may or may not recover upon proof of foreseeability.
Contrary to the view expressed by the Appellate Division majority (156 AD2d 500, 502), this is not a case of ’’substantial alteration or modification” of a product. Indeed, in this context, the ’’substantial alteration” rationale is nothing more than a red herring to be soundly rejected. First, and most obviously, plaintiffs’ claims here included a cause of action for failure to warn, as to which the Robinson holding is of questionable analytical utility (see, 1 Weinberger, New York Products Liability §23:10 [and authorities cited therein]). *537 While the focus of a design-defect claim such as that asserted in Robinson is the product’s fitness for intended uses (see, 49 NY2d, at 479), the focus of a failure to warn claim such as that asserted here is whether there has been a breach of the manufacturer’s duty to warn consumers against using the product for unintended but foreseeable purposes (see, Kriz v Schum, 75 NY2d 25, 36; McLaughlin v Mine Safety Appliances Co., 11 NY2d 62; Lancaster Silo & Block Co. v Northern Propane Gas Co., 75 AD2d 55; see generally, 1 Weinberger, op. cit., § 18:13).
Furthermore, the Robinson holding was premised, in part, on the principle that the validity of a design-defect claim should be assessed by reference to the configuration of the product "as of the time [it] leaves the manufacturer’s hands” (49 NY2d, at 479, supra). In a failure-to-warn case such as this, the gist of the claim is that the product was, in fact, defective "as of the time [it] le[ft] the manufacturer’s hands” because of the failure to include warnings of known or knowable dangers, including the danger of in-ground installation. Thus, the Robinson Court’s concern about holding manufacturers responsible for the postsale handling of their products by others is not implicated.
Additionally, Robinson is inapplicable because, unlike the circumstances in that case, where the purchaser "destroy[ed] the functional utility” of a key safety feature by cutting a 6-by-14-inch hole in the plexiglass portion of the safety gate (49 NY2d, at 477, 480), no physical alteration was made in the configuration or structure of Seaspray’s swimming pool (see also, Sage v Fairchild-Swearingen Corp., 70 NY2d 579, 586 [stressing the physical alteration of the machinery in Robinson]). Rather, the Susis and the professional installers they hired simply failed to follow the manufacturer’s instructions for above-ground installation, placing the vinyl pool some two feet below ground level instead. At worst, this was an "unintended use” or a misuse of defendant Seaspray’s product analogous to the plaintiffs misuse of an aquatic slide as a diving platform in Denkensohn v Davenport (75 NY2d 25, 36). Indeed, if Robinson is applicable to this situation, it is difficult to imagine when, if ever, a manufacturer could be held liable for injuries occasioned by unintended, although foreseeable, uses of its products.
Particularly troubling is the majority’s strained effort to bring this case within the Robinson rule by likening the *538 intended above-ground installation of this shallow pool to a form of "warning” analogous to the "safety feature” that was deliberately circumvented in Robinson (majority opn, at 533). First, despite the suggestion in the majority’s opinion (majority opn, at 533), there was nothing inherent in this four-foot pool’s "configuration” that made it an "above-ground” pool. To the contrary, as is apparent from this case, the pool’s "configuration” lent itself readily to in-ground uses. Thus, it was not the pool’s "configuration” that made it an "above-ground” pool; rather, it was made an "above-ground” pool by the accompanying installation instructions. The installer’s failure to follow those instructions certainly did not physically alter the product, much less alter it in such a way as to constitute a removal of a "safety feature”. Accordingly, there was no change in the pool’s "configuration” justifying the manufacturer’s failure to warn against foreseeable alternative installation methods, and the obligation to include appropriate warnings on that subject remains a question to be resolved by the fact finder.[2]
Second, while it is true that this type of pool may be somewhat safer when its bottom rests on the ground and its shallowness is consequently apparent, the pool’s intended above-ground use can hardly be characterized as a "safety feature.” As plaintiffs expert noted in his affidavit, vinyl above-ground pools, which were first marketed to the American consumer about 30 years ago, were designed to eliminate the expense of excavating and laying down a concrete or tile liner, thereby making pool ownership available to a wide spectrum of consumers (see also, Broder, The Hazards of Swimming Pools, NYLJ, Mar. 4, 1991, at 3, 5). This "above-ground” feature had both a positive and a negative effect: on the one hand, it drastically reduced the cost of private backyard pools; on the other hand, it imposed severe limitations on the possible depth of such pools, thereby creating a greatly enhanced risk of injury to users (see, e.g., Kriz v Schum, supra; Howard v Poseidon Pools, 72 NY2d 972; Manning v Manning, 72 NY2d 972; Smith v Stark, 67 NY2d 693). The majority’s effort to transform this commercially useful feature into its own "warning” or "safety” device stretches that concept well beyond its ordinary bounds.
In truth, in-ground installation was not a change in the *539 pool’s "configuration” or a conscious bypassing of a built-in safety feature (see, majority opn, at 532-533; Robinson v Reed-Prentice Div., supra, at 480), but rather was simply an unintended use of this four-foot vinyl pool.[3] Accordingly, consistent with all of the prior unintended use cases including Denkensohn (supra, at 36), the extent to which this particular departure from the above-ground pool’s intended use constitutes a defense to plaintiffs’ claim should depend on whether it was foreseeable.
Despite its reliance on Robinson, the majority appears to acknowledge that liability could attach if Seaspray had been aware that these above-ground pools were being installed in the ground. Yet, the majority nonetheless finds reason to dismiss plaintiffs’ claim because, in its view, plaintiffs’ expert evidence on this point was both "unsupported” and "conclusory.” The expert, however, stated clearly and specifically that the practice of installing above-ground pools below ground level so as to convey the appearance of an in-ground pool "is well known in the pool industry” and "for many years * * * [has] been a common practice.” Such a statement, made by an expert with 30 years’ experience in the safety and construction of vinyl pools, would, if believed by a jury, surely have been sufficient to support a finding that Seaspray knew, or at least should have known, that its products might well be installed in the ground by end users, creating an enhanced risk of diving injuries. Indeed, this expert’s statement was no more, "conclusory” than the expert evidence in Denkensohn, which the Court accepted as being probative on the issue of whether the plaintiff’s misuse of the defendant manufacturer’s product was "predictable” (75 NY2d, at 36, supra [emphasis supplied]).
As to the majority’s alternative objection to the experts’ affidavit as "unsupported,” I know of no rule of law or prior precedent that considers expert evidence suspect or of such reduced quality that corroboration is, as a matter of law, required. To the contrary, in Nallan v Helmsley-Spear, Inc. (50 *540 NY2d 507, 521) we accepted an expert’s statement on the deterrent effect of security guards as sufficient, in itself, to establish a prima facie claim of causation for submission to the jury (accord, Martin v Edwards Labs., 60 NY2d 417, 428-429 [accepting expert physician’s affidavit as sufficient to satisfy plaintiff’s obligation of going forward to defeat defense motion for dismissal]). The expert’s assertion here is entitled to be treated in the same manner, i.e., as sufficient, in itself, to raise a triable question of fact. The authorities on which the majority relies for the proposition that " 'facts or data’ ” are required to substantiate an expert’s statements (majority opn, at 534, n 2) are not helpful for the simple reason that the expert assertion at issue here — that an in-ground installation of these pools is an industry-wide practice — is a factual allegation and not a statement of conclusion or opinion.
In effect, by dismissing these plaintiffs’ expert evidence as "conclusory,” the majority has reached beyond its mandated "issue finding” function on these summary judgment motions and has instead improperly resolved a disputed factual issue on the basis of its view of the evidence’s weight. The result is that a potentially meritorious claim against a manufacturer that did not see fit either to provide adequate depth markers or to warn against the dangers of in-ground installation has been foreclosed. Since, in my view, plaintiffs’ claim against Seaspray is one that ought to be decided by a jury, I dissent from Court’s decision to dismiss it.
Chief Judge Wachtler and Judges Simons, Kaye and Bellacosa concur with Judge Alexander; Judge Titone dissents in part and votes to modify in a separate opinion in which Judge Hancock, Jr., concurs.
Order affirmed, etc.

. I agree with part III of the majority’s analysis, which upholds plaintiffs’ claims against the other defendants.

. In this regard, it is important to note that a warning against the risks of in-ground installation is not the equivalent of an antidiving warning.

. In Robinson, the plexiglass section of the machine that was mutilated was obviously a part of a safety gate and, accordingly, there was no doubt that the "safety feature” designed by the manufacturer had been consciously bypassed. Here, in contrast, the intended above-ground use of the pool was not so clearly a "safety feature,” at least in the absence of a warning to that effect. Consequently, it cannot be said that this "safety feature,” to the extent it may be reasonably characterized as such, was deliberate or conscious, as Robinson apparently requires.