■ Marie L. Bush, as Administrator of the Estate of William J. Bush, Deceased, Respondent, v Lamb-Grays Harbor Company, Appellant. (Action No. 1.) (And a Third-Party Action.) Richard J. Whittemore, Respondent, v Lamb-Grays Harbor Company, Appellant. (Action No. 2.) (And a Third-Party Action.) [668 NYS2d 64] —Peters, J. Appeal from an order of the Supreme Court (Dawson, J.), entered March 14, 1997 in Essex County, which partially denied defendant's motion for, *inter alia*, summary judgment dismissing the complaints in action Nos. 1 and 2.

On January 10, 1994, William J. Bush and plaintiff Richard J. Whittemore, employees of third-party defendant International Paper Company, Inc. (hereinafter IP), were involved in an industrial accident which fatally injured Bush and seriously injured Whittemore. Defendant designed, manufactured and sold the large system of equipment which was involved in the accident. It included a winder which wound and typically cut a large roll of paper weighing approximately 20,000 pounds into a number of smaller rolls. This roll of paper would then be released from the winder, rolled across a winder bridge gate and transfer table to a cradle. The cradle first stationed in a receive position and would then be moved to a neutral position. At that point, the winder bridge gate would be raised to a verti-

cal position facing the transfer table, creating a service aisleway so that workers, such as Bush and Whittemore, could prepare the winder for the next roll with their backs to the loaded cradle. Thereafter, the cradle, upon command, was lowered through an arm set lowerator to have the paper roll discharge downstream onto the factory floor. The position of the cradle would then be recycled back up from discharge to neutral and finally to receive.

The cradle was controlled by two control panels, a freestanding panel and a rear control panel. The freestanding panel originally moved the cradle from neutral to discharge and from discharge to receive by means of a sustaining activation button.[1] The up and down buttons were located next to each other; modifications by IP prior to this accident made such buttons into deadman controls[2] which permitted movement in either direction from any position. The location of such panel was on the far side of the discharge system, requiring the positioning of an employee's back to the discharge table. After the subject accident, such freestanding control panel was repositioned so that the operator viewed the rolls upon discharge and the up button was removed.

The rear control panel, located near the transfer table, had the capacity to move the cradle from receive to neutral and from neutral to receive and, by original design, utilized deadman controls allowing it to be stopped, reversed and even rocked in any position between receive and neutral. This rear control panel could send the cradle back upstream all the way to the receive position at any point in the cradle's cycle. Thus, if a loaded cradle were to go from receive down to neutral, the rear control panel, as originally designed, could then raise the cradle back to the receive position without having to fully cycle the cradle through its discharge position. Similarly, if the freestanding control panel took the loaded cradle from neutral toward discharge but had not gone all the way to discharge, the rear control panel could always bring the loaded cradle back up to the receive position.

The instant accident occurred when a machine operator at the freestanding control panel pushed and held the wrong button, causing the fully loaded cradle to go from neutral to receive. The roll thus discharged upstream across the transfer

---

1. A sustaining activation button is one that need only be pushed once and the equipment will perform its function without stopping.

2. A deadman button requires continuous human pressure throughout the machine function. A release of pressure from the button will result in a stoppage of the machine function.

table into the raised winder bridge gate where both Bush and Whittemore were working. The force of a 20,000-pound roll of paper pushed down the already raised winder bridge gate, crushing Bush and seriously injuring Whittemore.

Plaintiff Marie L. Bush, on behalf of Bush's estate, commenced the first of two actions against defendant for, *inter alia*, strict products liability and negligence in design of the system. Following commencement of a similar action by Whittemore, defendant, in a single joint motion, moved for summary judgment.[3] The premise underlying the motion was that defendant could not be held liable due to the unwarranted third-party change in the factory-designed and installed safety device in the freestanding control panel and that such modification was the proximate cause of the accident.

Plaintiffs opposed the motion by contending that the accidental upstream discharge of paper rolls by various causes was foreseeable, presented an unreasonable safety risk to workers in the service aisleway, and was easily preventable with numerous relatively simple solutions. Plaintiffs did not contest the fact that the upstream discharge of the paper roll would not have occurred in this instance from the operation of an unmodified freestanding control panel—certainly a proximate cause of the accident—only that other elements of the equipment's design, defective in nature, substantially contributed to the accident. In so contending, plaintiffs submitted testimony from employees who had witnessed rolls of paper moving upstream from the cradle into the raised winder bridge gate prior to any modification of the freestanding control panel and under circumstances where such panel was not in use. These instances caused near accidents similar to that which occurred here.

Plaintiffs also contended that the sustaining activation button on the unmodified freestanding control panel presented other serious hazards. Testimony revealed that the workers initiated the request for its change because, once activated, it permitted an unsupervised discharge of a 20,000-pound roll of paper. Worried that someone would get their foot caught underneath the cradle and would not be able to dislodge it without cycling the cradle to discharge, workers and ultimately IP engineers agreed that the removal of the sustaining activation button would address the safety concern. Moreover, they reasoned that such modification could not undercut any safety design since the suggested change mirrored the factory-built rear control panel.

---

**3.** Defendant commenced third-party actions in both cases against IP.

Supreme Court found, in a joint decision, that an issue of fact was raised as to whether the equipment was free from design defects at the time of manufacture and sale and whether such defects were a proximate cause of the accident. It accordingly denied that part of defendant's motion seeking summary judgment dismissing the products liability and negligence causes of action. Defendant appeals.

While we recognize that a third-party modification which destroys the functional utility of a safety device, rendering a safe product defective, deflects the responsibility which would typically befall a manufacturer (*see, Robinson v Reed-Prentice Div.*, 49 NY2d 471, 479-480), an accident may have more than one proximate cause (*see, Ayotte v Gervasio*, 186 AD2d 963, 964, *affd* 81 NY2d 1062; *Darmento v Pacific Molasses Co.*, 183 AD2d 1090, 1091, *affd* 81 NY2d 985). The existence thereof will not exonerate a defendant from liability (*see, Humphrey v State of New York*, 60 NY2d 742) if the defendant's negligence and unsafe design can be shown to be a substantial cause of the events which produced the injury (*see, Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315).

Viewing, as we must, the evidence in a light most favorable to plaintiffs (*see, Hierro v Bliss Co.*, 145 AD2d 731, 732), we agree that questions of fact have been raised as to whether the modification to the freestanding control panel exculpated defendant and whether such equipment was reasonably safe as manufactured and sold (*see, id.*). In light of defendant's showing, plaintiffs, in sustaining their burden, introduced sufficient evidentiary proof that rolls had been dangerously discharged upstream without adequate protection for workers in the aisleway not only before the modification of the freestanding panel but also by the use of the rear control panel. Contending that the impact of reverse-moving paper rolls upon the raised winder bridge at a time when workers would be present in the aisleway was a foreseeable hazard which should have been addressed in product design, plaintiffs contended that there were several alternatives that were both technologically and economically feasible at the time of manufacture.

Design alternatives suggested by plaintiffs' engineering expert included, *inter alia*, the use of resilient mechanical stops or metal pins inserted into each side of the winder bridge whenever the bridge was raised to prevent an inadvertent and dangerous descent, a warning alarm to alert workers of any upstream movement of a loaded cradle and an alteration of the proximity of the up and down buttons on the freestanding control panel to avoid inadvertent activation. With both the

requisite risk-utility analysis and the "determination 'of whose fault played the more critical role in [the] causation [of the accident being] properly left to the fact finder' " (*Garrison v Clark Mun. Equip.*, 241 AD2d 872, 874, quoting *Facci v General Elec. Co.*, 192 AD2d 991, 992-993), we decline to disturb Supreme Court's determination.

As to defendant's request for a dismissal of those claims predicated upon violations of Federal regulations (*see,* 29 CFR 1910.212, 1910.261), our review of the context in which such claims arose indicates that such violations were cited only as supportive of the contentions underlying the products liability and negligence causes of action (*see, Jemmott v Rockwell Mfg. Co.*, 216 AD2d 444, 444-445).

Mikoll, J. P., White, Yesawich Jr. and Carpinello, JJ., concur. Ordered that the order is affirmed, with one bill of costs.