87 N.Y.2d 248 (1995)
662 N.E.2d 730
639 N.Y.S.2d 250
Nancy Denny et al., Plaintiffs,
v.
Ford Motor Company, Defendant.
Court of Appeals of the State of New York.
Argued September 14, 1995
Decided December 5, 1995.
O'Melveny & Myers (John H. Beisner and Brian D. Boyle, of the District of Columbia Bar, admitted pro hac vice, of counsel) and Gibson, McAskill & Crosby, Buffalo (Brian P. Crosby of counsel), for defendant.
Paul F. McAloon, P. C., New York City (Paul F. McAloon of counsel), John Scarzafava, Oneonta, and Cook & Butler, L.L.P. (Russell L. Cook, Jr., of the Texas Bar, admitted pro hac vice, of counsel), for plaintiffs.
Herzfeld & Rubin, P. C., New York City (Michael Hoenig, David B. Hamm and Miriam Skolnik of counsel), for Product Liability Advisory Council, Inc., amicus curiae.
Chief Judge KAYE and Judges BELLACOSA, SMITH, LEVINE and CIPARICK concur with Judge TITONE; Judge SIMONS dissents in a separate opinion.
*251 TITONE, J.
Are the elements of New York's causes of action for strict products liability and breach of implied warranty always coextensive? If not, can the latter be broader than the former? These are the core issues presented by the questions that the United States Court of Appeals for the Second Circuit has certified to us in this diversity action involving an allegedly defective vehicle. On the facts set forth by the Second Circuit, we hold that the causes of action are not identical and that, under the circumstances presented here, it is possible to be liable for breach of implied warranty even though a claim of strict products liability has not been satisfactorily established.

I.
As stated by the Second Circuit, this action arises out of a June 9, 1986 accident in which plaintiff Nancy Denny was severely injured when the Ford Bronco II that she was driving rolled over. The rollover accident occurred when Denny slammed on her brakes in an effort to avoid a deer that had walked directly into her motor vehicle's path. Denny and her spouse sued Ford Motor Co., the vehicle's manufacturer, asserting claims for negligence, strict products liability and breach of implied warranty of merchantability (see, UCC 2-314 [2] [c]; 2-318). The case went to trial in the District Court for the Northern District of New York in October of 1992.
*252 The trial evidence centered on the particular characteristics of utility vehicles, which are generally made for off-road use on unpaved and often rugged terrain. Such use sometimes necessitates climbing over obstacles such as fallen logs and rocks. While utility vehicles are traditionally considerably larger than passenger cars, some manufacturers have created a category of down-sized "small" utility vehicles, which are designed to be lighter, to achieve better fuel economy and, presumably, to appeal to a wider consumer market. The Bronco II in which Denny was injured falls into this category.
Plaintiffs introduced evidence at trial to show that small utility vehicles in general, and the Bronco II in particular, present a significantly higher risk of rollover accidents than do ordinary passenger automobiles. Plaintiffs' evidence also showed that the Bronco II had a low stability index attributable to its high center of gravity and relatively narrow track width. The vehicle's shorter wheel base and suspension system were additional factors contributing to its instability. Ford had made minor design changes in an effort to achieve a higher stability index, but, according to plaintiffs' proof, none of the changes produced a significant improvement in the vehicle's stability.
Ford argued at trial that the design features of which plaintiffs complained were necessary to the vehicle's off-road capabilities. According to Ford, the vehicle had been intended to be used as an off-road vehicle and had not been designed to be sold as a conventional passenger automobile. Ford's own engineer stated that he would not recommend the Bronco II to someone whose primary interest was to use it as a passenger car, since the features of a four-wheel-drive utility vehicle were not helpful for that purpose and the vehicle's design made it inherently less stable.
Despite the engineer's testimony, plaintiffs introduced a Ford marketing manual which predicted that many buyers would be attracted to the Bronco II because utility vehicles were "suitable to contemporary life styles" and were "considered fashionable" in some suburban areas. According to this manual, the sales presentation of the Bronco II should take into account the vehicle's "suitab[ility] for commuting and for suburban and city driving." Additionally, the vehicle's ability to switch between two-wheel and four-wheel drive would "be particularly appealing to women who may be concerned about driving in snow and ice with their children." Plaintiffs both testified that *253 the perceived safety benefits of its four-wheel-drive capacity were what attracted them to the Bronco II. They were not at all interested in its off-road use.
At the close of the evidence, the District Court Judge submitted both the strict products liability claim and the breach of implied warranty claim, despite Ford's objection that the two causes of action were identical. With respect to the strict products liability claim the court told the jury that "[a] manufacturer who places a product on the market in a defective condition is liable for injury which results from use of the product when the product is used for its intended or reasonably foreseeable purpose." Further, the court stated:
"A product is defective if it is not reasonably safe. * * * It is not necessary for the plaintiffs to prove that the defendant knew or should have known of the product[']s potential for causing injury to establish that the product was not reasonably safe. Rather, the plaintiffs must prove by a preponderance of the evidence that a reasonable person * * * who knew of the product's potential for causing injury and the existence of available alternative designs * * * would have concluded that such a product should not have been marketed in that condition. Such a conclusion should be reached after balancing the risks involved in using the product against the product[']s usefulness and its costs against the risks, usefulness and costs of the alternative design as compared to the product defendant did market."
With respect to the breach of implied warranty claim, the court told the jury:
"The law implies a warranty by a manufacturer which places its product on the market that the product is reasonably fit for the ordinary purpose for which it was intended. If it is, in fact, defective and not reasonably fit to be used for its intended purpose, the warranty is breached.
"The plaintiffs claim that the Bronco II was not fit for its ordinary purpose because of its alleged *254 propensity to rollover and lack of warnings to the consumer of this propensity."[1]
Neither party objected to the content of these charges.
In response to interrogatories, the jury found that the Bronco II was not "defective" and that defendant was therefore not liable under plaintiffs' strict products liability cause of action. However, the jury also found that defendant had breached its implied warranty of merchantability and that the breach was the proximate cause of Nancy Denny's injuries. Following apportionment of damages, plaintiff was awarded judgment in the amount of $1.2 million.
Ford subsequently moved for a new trial under rule 59 (a) of the Federal Rules of Civil Procedure, arguing that the jury's finding on the breach of implied warranty cause of action was irreconcilable with its finding on the strict products liability claim. The trial court rejected this argument, holding that it had been waived and that, in any event, the verdict was not inconsistent.
On defendant's appeal, a majority at the Second Circuit held that defendant's trial conduct had not resulted in a waiver of the inconsistency issue. Reasoning that the outcome of the appeal depended upon the proper application of New York law, the court certified the following questions for consideration by this Court pursuant to article VI, § 3 (b) (9) of the State Constitution and rule 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17): (1) whether the strict products liability claim and the breach of implied warranty claim are identical; (2) whether, if the claims are different, the strict products liability claim is broader than the implied warranty claim and encompasses the latter; and (3) whether, if the claims are different and a strict liability claim may fail while an implied warranty claim succeeds, the jury's finding of no product defect is reconcilable with its finding of a breach of warranty.

II.
In this proceeding, Ford's sole argument is that plaintiffs' strict products liability and breach of implied warranty causes of action were identical and that, accordingly, a defendant's verdict on the former cannot be reconciled with a plaintiff's verdict on the latter. This argument is, in turn, premised on both the intertwined history of the two doctrines and the close *255 similarity in their elements and legal functions. Although Ford recognizes that New York has previously permitted personal injury plaintiffs to simultaneously assert different products liability theories in support of their claims (see, Victorson v Bock Laundry Mach. Co., 37 N.Y.2d 395, 400), it contends that the breach of implied warranty cause of action, which sounds in contract, has been subsumed by the more recently adopted, and more highly evolved, strict products liability theory, which sounds in tort. Ford's argument has much to commend it. However, in the final analysis, the argument is flawed because it overlooks the continued existence of a separate statutory predicate for the breach of warranty theory and the subtle but important distinction between the two theories that arises from their different historical and doctrinal root.
When products liability litigation was in its infancy, the courts relied upon contractual warranty theories as the only existing means of facilitating economic recovery for personal injuries arising from the use of defective goods (e.g., Mendel v Pittsburgh Plate Glass Co., 25 N.Y.2d 340, overruled on other grounds Victorson v Bock Laundry Mach. Co., supra; Blessington v McCrory Stores Corp., 305 N.Y. 140; see, Heller v U. S. Suzuki Motor Corp., 64 N.Y.2d 407, 410). Citing statutory authority (UCC 2-314, 2-715 [2] [b]; former Personal Property Law § 96 [1]), the courts posited the existence of an implied warranty arising as an incident of the product's sale and premised a cause of action for consequential personal injuries based on breaches of that warranty (see, Heller v U. S. Suzuki Motor Corp., supra, at 410).
Eventually, the contractually based implied warranty theory came to be perceived as inadequate in an economic universe that was dominated by mass-produced products and an impersonal marketplace. Its primary weakness was, of course, its rigid requirement of a relationship of privity between the seller and the injured consumer  a requirement that often could not be satisfied (see, Martin v Dierck Equip. Co., 43 N.Y.2d 583, 589-590). Some courts (including ours) recognized certain narrow exceptions to the privity requirement in an effort to avoid the doctrine's harsher effects (e.g., Greenberg v Lorenz, 9 N.Y.2d 195; see, Heller v U. S. Suzuki Motor Corp., supra, at 410; Prosser and Keeton, Torts § 96, at 682 [5th ed]). However, the warranty approach remained unsatisfactory, and the courts shifted their focus to the development of a new, more flexible tort cause of action: the doctrine of strict products liability (Martin v Dierck Equip. Co., supra, at 590; Micallef v Miehle Co., 39 N.Y.2d 376; Victorson v Bock Laundry Mach. Co., supra, at 402; *256 see, Codling v Paglia, 32 N.Y.2d 330; Goldberg v Kollsman Instrument Corp., 12 N.Y.2d 432, 436; see also, MacPherson v Buick Motor Co., 217 N.Y. 382).
The establishment of this tort remedy has, as this Court has recognized, significantly diminished the need to rely on the contractually based breach of implied warranty remedy as a means of compensating individuals injured because of defective products (see, Heller v U. S. Suzuki Motor Corp., supra, at 411; Martin v Dierck Equip. Co., supra, at 590). Further, although the available defenses and applicable limitations principles may differ, there is a high degree of overlap between the substantive aspects of the two causes of action (see, Victorson v Bock Laundry Mach. Co., supra, at 405). Indeed, on an earlier occasion, this Court observed, in dictum, that "strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action" (Mendel v Pittsburgh Plate Glass Co., supra, at 345; accord, Gumbs v International Harvester, 718 F.2d 88 [3d Cir]; Sterno Aero AB v Page Airmotive, 499 F.2d 709, 712 [10th Cir]; Larsen v Pacesetter Sys., 74 Haw 1, 837 P2d 1273; 1 Frumer and Friedman, Products Liability § 2.03, at 2-28; 2 Frumer, op. cit., § 9.04 [1], at 9-42, 9-44; Clark and Smith, Product Warranties ¶ 12.03 [1], at 12-7).
Nonetheless, it would not be correct to infer that the tort cause of action has completely subsumed the older breach of implied warranty cause of action or that the two doctrines are now identical in every respect (see, Di Prospero v Brown & Sons, 110 AD2d 250, 251). The continued vitality of the warranty approach is evidenced by its retention and expansion in New York's version of the Uniform Commercial Code (UCC 2-314 [2] [c]; 2-318). The existence of this statutory authority belies any argument that the breach of implied warranty remedy is a dead letter (see, Heller v U. S. Suzuki Motor Corp., supra, at 411-412).[2]
Although the products liability theory sounding in tort and the breach of implied warranty theory authorized by the UCC coexist and are often invoked in tandem, the core element of "defect" is subtly different in the two causes of action. Under *257 New York law, a design defect may be actionable under a strict products liability theory if the product is not reasonably safe. Since this Court's decision in Voss v Black & Decker Mfg. Co. (59 N.Y.2d 102, 108), the New York standard for determining the existence of a design defect has required an assessment of whether "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner" (see also, Cover v Cohen, 61 N.Y.2d 261, 270; Robinson v Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 479). This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes (Voss v Black & Decker Mfg. Co., supra, at 109). The above-described analysis is rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits (see, Prosser and Keeton, op. cit., § 99, at 699). In such circumstances, a weighing of the product's benefits against its risks is an appropriate and necessary component of the liability assessment under the policy-based principles associated with tort law.
The adoption of this risk/utility balance as a component of the "defectiveness" element has brought the inquiry in design defect cases closer to that used in traditional negligence cases, where the reasonableness of an actor's conduct is considered in light of a number of situational and policy-driven factors.[3] While efforts have been made to steer away from the fault-oriented *258 negligence principles by characterizing the design defect cause of action in terms of a product-based rather than a conduct-based analysis (see, e.g., Voss v Black & Decker Mfg. Co., supra, at 107; Barker v Lull Eng'g Co., 20 Cal 3d 413, 418, 573 P2d 443; Prosser and Keeton, op. cit., § 96, at 689), the reality is that the risk/utility balancing test is a "negligence-inspired" approach, since it invites the parties to adduce proof about the manufacturer's choices and ultimately requires the fact finder to make "a judgment about [the manufacturer's] judgment" (Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand L Rev 593, 610, 648; see, e.g., Sage v Fairchild-Swearingen Corp., 70 N.Y.2d 579, 587; cf., Enright v Lilly & Co., 77 N.Y.2d 377, 387 [failure to warn claim "though * * * couched in terms of strict liability, is indistinguishable from a negligence claim"]). In other words, an assessment of the manufacturer's conduct is virtually inevitable, and, as one commentator observed, "[i]n general, * * * the strict liability concept of `defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing" (Schwartz, New Products, Old Products, Evolving Law, Retroactive Law, 58 NYU L Rev 796, 803, citing United States v Carroll Towing Co., 159 F.2d 169, 173 [Hand, J.]; see, e.g., Gauthier v AMF, Inc., 788 F.2d 634, 637 [9th Cir] [Mont law]; Birchfield v International Harvester Co., 726 F.2d 1131, 1139 [6th Cir] [Ohio law]; St. Germain v Husqvarna Corp., 544 A2d 1283, 1285 [Me]; 1 Frumer and Friedman, op. cit., § 2.02, at 2-14  2-16; § 2.04, at 2-35  2-36; Henderson and Twerski, Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn, 65 NYU L Rev 265, 271-272).
It is this negligence-like risk/benefit component of the defect element that differentiates strict products liability claims from UCC-based breach of implied warranty claims in cases involving design defects. While the strict products concept of a product that is "not reasonably safe" requires a weighing of the product's dangers against its over-all advantages, the UCC's concept of a "defective" product requires an inquiry only into whether the product in question was "fit for the ordinary purposes for which such goods are used" (UCC 2-314 [2] [c]).[4] The latter inquiry focuses on the expectations for the performance *259 of the product when used in the customary, usual and reasonably foreseeable manners. The cause of action is one involving true "strict" liability, since recovery may be had upon a showing that the product was not minimally safe for its expected purpose  without regard to the feasibility of alternative designs or the manufacturer's "reasonableness" in marketing it in that unsafe condition.
This distinction between the "defect" analysis in breach of implied warranty actions and the "defect" analysis in strict products liability actions is explained by the differing etiology and doctrinal underpinnings of the two distinct theories. The former class of actions originates in contract law, which directs its attention to the purchaser's disappointed expectations; the latter originates in tort law, which traditionally has concerned itself with social policy and risk allocation by means other than those dictated by the marketplace.
The dissent takes issue with the foregoing conclusion, arguing, in essence, that any residual distinction that exists between the two causes of action should be eliminated and that the analysis for "defect" in implied warranty claims should be deemed to encompass the risk/utility analysis that has previously been incorporated in tort causes of action. This argument is predicated on the dissent's view that the common history of the two causes of action and the perceived advantages of risk/utility analysis counsel in favor of the use of a unitary standard. The dissent has even gone so far as to suggest that the breach of implied warranty cause of action should be treated like a tort claim despite the fact that it is based on the provisions of the Uniform Commercial Code.
What the dissent overlooks is that, as long as that legislative source of authority exists, we are not free to merge the warranty cause of action with its tort-based sibling regardless of whether, as a matter of policy, the contract-based warranty claim may fairly be regarded as a historical relic that no longer has any independent substantive value. Rather, we must construe and apply this separate remedy in a manner that remains consistent with its current roots in contract law (see, Codling v Paglia, supra [recognizing a tort cause of action to avoid stretching the breach of implied warranty theory to the point where it no longer reflects its origin as part of the bargain between the consumer and seller]).
*260 To the extent that the dissent advocates a merger of the common-law and statutory causes of action through the use of a single analytical standard, its argument is undermined by an examination of what other jurisdictions have done. In most of the cases where the courts have pronounced the merger of breach of warranty with the other products liability theories sounding in tort, they were relying on specific State statutory schemes that were enacted to govern products liability litigation, contain express preemptive language and also specifically define "product liability claim" as one encompassing breach of express or implied warranty as well as negligence and strict liability in tort (see, e.g., Philpott v Robbins Co., 710 F.2d 1422 [applying Ore Rev Stat § 30.905]; Chamberlain v Schmutz Mfg. Co., 532 F Supp 588 [applying Kan Stat Ann § 60-3301]; Daily v New Britain Mach. Co., 200 Conn 562, 512 A2d 893 [applying Conn Gen Stat Ann § 52-572m]; Washington Water Power Co. v Graybar Elec. Co., 112 Wash 2d 847, 774 P2d 1199 [applying Wash Rev Code Ann § 7.72.010]; see also, McWilliams v Yamaha Motor Corp., 780 F Supp 251, revd on other grounds 987 F.2d 200; but see, Grinnel v Pfizer & Co., 274 Cal App 2d 424, 432, 79 Cal Rptr 369). Indeed, the proposed Model Uniform Product Liability Act, which was issued by the Commerce Department in 1979 (reprinted in 3B Frumer and Friedman, op. cit., Appendix B; see, 44 Fed Reg 62721), embodies precisely the kind of doctrinal merger that the dissent advocates. New York, of course, has not adopted the Model Act or any other such unifying measures.[5]
Contrary to the dissent's suggestion, the current version of UCC 2-318 is not the equivalent of these uniform product liability provisions, nor does it manifest an intention by our State's Legislature to engraft a tort cause of action onto a UCC article that concerns itself principally with the contract-based obligations (see, dissenting opn, at 272). Indeed, the Law Revision Commission Staff Notes, which the dissent cites, clearly state that the proposed amendments to UCC 2-318 "would * * * allow recovery by the [strict products liability] plaintiffs on a different cause of action" (Bill Jacket, L 1975, ch 774, Mem of NY Law Rev Commn, Staff Notes relating to A-3070 [emphasis supplied]). Similarly, the Sponsoring Memorandum on which the dissent relies states that the bill's purpose was to *261 "extend more intelligently the warranty provided to a purchaser of goods under the UCC" (Mem of Assemblyman Silverman, reprinted in 1975 NY Legis Ann, at 110). In fact, it is evident from the legislative materials accompanying the bill's passage that its purpose was to expand the class of plaintiffs who can avail themselves of the Code's warranty remedies and not to transform those remedies into a new tort cause of action (see, 1A ULA 558 [Master ed], UCC 2-318, Official Comment).
Moreover, the dissent's novel proposal that the contract-based consumer-expectation test should be abandoned for the tort-based risk/utility approach even for contract-based warranty claims has not been embraced or even suggested by any of the risk/utility advocates that the dissent cites. For example, although the drafters of the Third Restatement have endorsed risk/utility analysis for design defect cases sounding in tort, they also have made clear that claims based on warranty theories are "not within the scope" of the newly drafted section and are, in fact, "unaffected by it" (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2, Mar. 13, 1995] § 2, comment m, at 42). Further, the drafters have noted that "[w]arranty law as a body of legal doctrine separate from tort may impose legal obligations that go beyond those set forth" in the Restatement of Torts (id., comment q, at 46).
Similarly, while the commentators on which the dissent relies criticize the consumer-expectation-based tests for product defect and argue instead for the use of a risk/utility approach, their arguments are addressed to tort causes of action alone. One of the cited commentators, for example, argues that the consumer expectation test is a "blunt instrument" "when it comes to recognizing and maximizing the * * * goals, objectives, interests and values important to modern tort law" (Kennedy, The Role of the Consumer Expectation Test under Louisiana's Products Liability Tort Doctrine, 69 Tul L Rev 117, 152 [emphasis supplied]). The same commentator also acknowledges that different standards might be appropriate for different theories of recovery where other objectives and values are pertinent (id.). Another commentator cited by the dissent contends that the risk/utility analysis should be used in place of a consumer-expectation test, but the argument is, once again, premised on the assumption that the latter "is not a tort way of looking at the problem of product defect" (Birnbaum, op. cit., at 646 [emphasis supplied]). This commentator also affirmatively criticizes courts that have failed "to separate conceptually the notions of strict liability, negligence, warranty, and absolute liability" (id., at 601).
*262 Significantly, the consumer-expectation test has its advocates as well as its critics. In fact, the proposed Model Uniform Products Liability Act has itself been criticized on the ground that it does what the dissent urges, i.e., it eliminates consumer expectation as a test for tort claims (Twerski and Weinstein, A Critique of the Uniform Products Liability Law  A Rush to Judgment, 28 Drake L Rev 221, 230-233; accord, 1 Frumer and Friedman, op. cit., § 1.08 [2] [c] [ii]). Such criticisms stem from recent expressions by "courts and commentators [of] considerable support for a threshold test which does not require that the complexities of risk-utility analysis be undertaken in every design defect case" (Twerski and Weinstein, op. cit., at 230-231). In view of the "rigors of the risk-utility test," it has been suggested that it is "worthwhile" to retain the consumer-expectation test and "explor[e] solutions to [its] subjectivity problem" rather than simply abandoning it (id., at 232).[6]
In any event, while the critics and commentators may debate the relative merits of the consumer-expectation and risk/utility tests, there is no existing authority for the proposition that the risk/utility analysis is appropriate when the plaintiff's claim rests on a claimed breach of implied warranty under UCC 2-314 (2) (c) and 2-318. Further, the absence of authority for the dissent's position is not surprising since the negligence-like risk/utility approach is foreign to the realm of contract law.
As a practical matter, the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases. In this case, however, the nature of the proof and the way in which the fact issues were litigated demonstrates how the two causes of action can diverge. In the trial court, Ford took the position that the design features of which plaintiffs complain, i.e., the Bronco II's high center of gravity, narrow track width, short wheel base and specially tailored suspension system, were important to preserving the vehicle's ability to drive over the highly irregular terrain that typifies off-road travel. Ford's proof in this regard was relevant to the strict products liability risk/utility equation, which required the fact finder to determine whether the Bronco II's value as an off-road vehicle outweighed the risk of the rollover accidents that could occur when the vehicle was used for other driving tasks.
*263 On the other hand, plaintiffs' proof focused, in part, on the sale of the Bronco II for suburban driving and everyday road travel. Plaintiffs also adduced proof that the Bronco II's design characteristics made it unusually susceptible to rollover accidents when used on paved roads. All of this evidence was useful in showing that routine highway and street driving was the "ordinary purpose" for which the Bronco II was sold and that it was not "fit"  or safe  for that purpose.
Thus, under the evidence in this case, a rational fact finder could have simultaneously concluded that the Bronco II's utility as an off-road vehicle outweighed the risk of injury resulting from rollover accidents and that the vehicle was not safe for the "ordinary purpose" of daily driving for which it was marketed and sold. Under the law of this State such a set of factual judgments would lead to the concomitant legal conclusion that plaintiffs' strict products liability cause of action was not viable but that defendant should nevertheless be held liable for breach of its implied promise that the Bronco II was "merchantable" or "fit" for its "ordinary purpose." Importantly, what makes this case distinctive is that the "ordinary purpose" for which the product was marketed and sold to the plaintiff was not the same as the utility against which the risk was to be weighed. It is these unusual circumstances that give practical significance to the ordinarily theoretical difference between the defect concepts in tort and statutory breach of implied warranty causes of action (see, e.g., McLaughlin v Michelin Tire Corp., 778 P2d 59, 66-67 [Wyo]; accord, 1 Madden, Products Liability § 5.11, at 160 [2d ed]).
From the foregoing it is apparent that the causes of action for strict products liability and breach of implied warranty of merchantability are not identical in New York and that the latter is not necessarily subsumed by the former. It follows that, under the circumstances presented, a verdict such as the one occurring here  in which the manufacturer was found liable under an implied warranty cause of action and not liable under a strict products cause of action  is theoretically reconcilable under New York law. Whether the particular verdict produced by the jury in this case was reconcilable in light of the charge and in accordance with case law applying rule 59 (a) of the Federal Rules of Civil Procedure is a question of Federal procedure which we are not well positioned to *264 resolve.[7] Hence, we construe the third certified question as posing only the theoretical question of whether this jury's verdict is hypothetically possible under New York's governing legal principles.
Accordingly, certified question No. 1 should be answered in the negative, certified question No. 2 in the negative and certified question No. 3 in the affirmative.
SIMONS, J. (dissenting).
I agree with the majority that causes of action in strict products liability and breach of implied warranty are not identical. In my view, however, the strict products liability claim is substantively broader than and encompasses the implied warranty claim and, thus, the jury's verdict of no defect in the products liability cause of action is not reconcilable with its finding of breach of implied warranty. Accordingly, I would answer the first two questions certified to the Court no and yes and find it unnecessary to answer the third question.

I
Liability without fault may be imposed against a manufacturer or supplier of a defective product and in favor of one injured by the product. The product may be defective because it is improperly made, because its design is defective or because the manufacturer's warnings against foreseeable risks in using it are inadequate. The members of the Court agree that strict products liability and implied warranty are similar in the sense that both causes of action require that, before plaintiff may recover, the product be defective, i.e., there must be something wrong with it. We disagree, however, over how defectiveness is determined. The question does not appear to have been previously addressed by the Court in the context of personal injury litigation.
The majority concludes that the implied warranty and strict products liability causes of action are different because the existence of an actionable defect is determined by two different *265 analyses. Viewing implied warranty from a contract perspective, it would define defectiveness by whether the product lived up to the consumer's expectations whereas defectiveness, for strict products liability purposes, is determined by application of the risk/utility standard. In my judgment, the consumer expectation standard, appropriate to commercial sales transactions, has no place in personal injury litigation alleging a design defect and may result in imposing absolute liability on marketers of consumers' products. Whether a product has been defectively designed should be determined in a personal injury action by a risk/utility analysis.

A
Logically, there is no substantive difference for testing liability in the two causes of action. Recovery in each depends upon establishing that the product was defective because improperly designed. But the word "defect" has no clear legal meaning. In this case, the court defined defect in its strict products liability charge but did not attempt to define it otherwise; in the warranty cause of action the meaning had to be found in the court's instructions describing the nature of the cause of action. Nevertheless, the predicate for recovery in both claims was the same.
The court charged the jury that to recover in strict products liability the plaintiffs had to prove that the Bronco II was "defective" when it was placed on the market. A product is defective, the court said, if it is "not reasonably safe" when used for "its intended or reasonably foreseeable purpose." That charge was consistent with settled New York law which holds that a manufacturer or supplier may be strictly liable for injuries sustained when a product is used for its intended purpose or for an unintended but reasonably foreseeable purpose (see, Lugo v LTN Toys, 75 N.Y.2d 850, 852; Micallef v Miehle Co., 39 N.Y.2d 376, 385-386; Biss v Tenneco, Inc., 64 AD2d 204, 206). The court charged the jury that to recover for breach of implied warranty the plaintiff was required to establish that the Bronco II was not "reasonably fit for the ordinary purpose for which it was intended." That instruction is consistent with language found in UCC 2-314 (2) (c).
When these two definitions are compared, it is apparent that a defect for strict products liability purposes is broader than a defect for implied warranty purposes. The vehicle could not have been defective when used for its ordinary and intended purpose (warranty), but not defective and reasonably safe when *266 used for its "intended or for an unintended but reasonably foreseeable purpose" (strict products liability). As the Court of Appeals observed, foreseeable use "certainly includes all uses that are `ordinary' [and] perhaps some that are not `ordinary'" (see, Denny v Ford Motor Co., 42 F.3d 106, 112). The jury having concluded that the Bronco II was not defective for strict products liability purposes, could not logically conclude that it was defective for warranty purposes.

B
Nor is there any legal reason to distinguish the two causes of action in this respect. Breach of implied warranty and strict liability in tort developed from separate legal doctrines but are not materially different when applied to personal injury claims involving design defects. While breach of implied warranty retains its contractual law characteristics when applied to commercial transactions, it has been consistently recognized that it is a tort when applied to personal injury litigation and that tort principles should apply. To introduce a new test of defectiveness into tort litigation  one based on contract principles  can only destabilize the well-settled law in this area. Both causes of action are torts and defectiveness for both should be determined by the same standard.
The law imposing liability without fault against those making and marketing consumer products evolved in stages, progressing from negligence to implied warranty and eventually to the adoption in New York of a new cause of action known as strict products liability. Implied warranty has been generally associated with the law of contracts (although the Restatement advises us warranty was originally a matter of tort liability), but if implied warranty ever was a contract doctrine, it is now something very different from the warranty cause of action used in commercial transactions (see, Restatement [Second] of Torts § 402 A, comment m; 5 Harper, James and Gray, Torts § 28.27, at 540 [2d ed]; Prosser and Keeton, Torts § 97, at 691 [5th ed]; 1 Weinberger, New York Products Liability § 15:03). Indeed, the idea that there could ever be a claim for breach of implied warranty without privity is a concept entirely foreign to contract law. Moreover, the liability currently imposed in the name of warranty goes far beyond any liability based upon conventional contract notions and encompasses such tort concepts as consequential damages and contributory fault. As Dean Prosser has said: "[T]his warranty, if that is the name for it * * * is something separate and *267 distinct which sounds in tort exclusively, and not at all in contract; which exists apart from any contract between the parties; and which makes for strict liability in tort" (Prosser, Spectacular Change: Products Liability in General, 36 Cleveland Bar Assn J 149, 167-168).
Finally, there can be no doubt about how this Court has viewed the action. We have repeatedly recognized not only that breach of implied warranty when asserted to recover for personal injuries is a tortious wrong (see, Victorson v Bock Laundry Mach. Co., 37 N.Y.2d 395, 402; Velez v Craine & Clark Lbr. Corp., 33 N.Y.2d 117, 124 [converting an action in implied warranty to one for strict products liability]; Codling v Paglia, 32 N.Y.2d 330, 340, quoting Singer v Walker, 39 AD2d 90; Goldberg v Kollsman Instrument Corp., 12 N.Y.2d 432, 436), but also "that strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action" (Mendel v Pittsburgh Plate Glass Co., 25 N.Y.2d 340, 345).
Nevertheless, the idea that contractual principles inhere in breach of implied warranty claims for personal injuries has persisted, producing conceptual difficulties and anomalies when the courts tried to apply the cause of action in a tort setting (see, Prosser and Keeton, Torts § 97, at 692 [5th ed]). In Codling v Paglia (32 N.Y.2d 330, supra), we were confronted with a claim in implied warranty seeking to impose liability against a manufacturer in favor of a nonuser bystander injured by a defective automobile. We had long since abandoned the privity requirement in many personal injury claims based on implied warranty and incrementally extended the duty of manufacturers and suppliers not only to purchasers and users, but to users' family members (see, Greenberg v Lorenz, 9 N.Y.2d 195), to remote purchasers (Randy Knitwear v American Cyanamid Co., 11 N.Y.2d 5), to an airline passenger suing the manufacturer of a defective component part of an airplane (Goldberg v Kollsman Instrument Corp., 12 N.Y.2d 432, supra), and to rescuers suing the manufacturer of a defective oxygen mask (Guarino v Mine Safety Appliance Co., 25 N.Y.2d 460). In Codling we recognized the difficulties in adopting implied warranty principles in personal injury claims and, abandoning privity entirely, recognized a new cause of action under the broad principle of strict products liability, as other courts before us had done, to hold the manufacturer liable to the bystander.
This new cause of action was not separate from implied warranty but an amalgam which had been constructed by the *268 courts to establish a cause of action for liability without fault by merging warranty concepts (to avoid fault analysis) with negligence concepts (to avoid privity) (see, Victorson v Bock Laundry Mach. Co., 37 N.Y.2d 395, 401, supra; Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 1). The new cause of action recognized products liability as a discrete area of tort law, which borrows from both negligence and warranty, and attempts to avoid the confusion spawned by trying to categorize the various claims and remedies under prior law (id.). It imposes strict liability as a matter of social policy predicated on the idea that defendants ought "to pay for the costs attributable to damaging events caused by defects of a kind that made the product more dangerous than it would otherwise be", concerns that had little to do with conventional contract principles (see, Prosser and Keeton, Torts § 98, at 692 [5th ed]). A difficulty has arisen, however, because in recognizing a cause of action for strict products liability, the courts have not had "a clear notion about the `meaning of defect'", especially in the context of defective design cases (id.).
In sum, although procedural distinctions may remain because mandated by the Legislature's enactment of various provisions of the Uniform Commercial Code (see, Heller v U. S. Suzuki Motor Corp., 64 N.Y.2d 407, 411), strict products liability and breach of implied warranty causes of action are substantively similar and impose liability without fault (see, Martin v Dierck Equip. Co., 43 N.Y.2d 583, 589-590; Mendel v Pittsburgh Plate Glass Co., 25 N.Y.2d 340, 345, supra; Ryion v Len-Co Lbr. Corp., 152 AD2d 978; Dickey v Lockport Prestress, 52 AD2d 1075, 1076). It makes little sense, therefore, to perpetuate a legal distinction between them based upon the method for determining defectiveness, particularly when the flaws in the consumer expectation standard for measuring defectiveness are recognized.

II
The majority has not attempted to define the consumer expectation standard, nor did the District Court use the phrase in its charge. Under one formulation, however, the standard provides that a product is defective, i.e., it is unreasonably dangerous, if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics" (see, Restatement [Second] of Torts § 402 A, comment i; see also, Kennedy, The Role of the Consumer Expectation Test under Louisiana's Products Liability Tort Doctrine, 69 Tul L Rev 117, 120 [1994]). *269 The consumer expectation standard originated from the sales notion that a seller could agree, expressly or impliedly, to indemnify a buyer if the purchased product did not satisfy the buyer's purposes. The obligation to "indemnify" applied only to the parties to the sale, those in privity, and did not "run with the goods" (see, 5 Harper, James and Gray, op. cit., § 28.16, at 454). As evolving social policy sought to hold manufacturers and sellers liable for personal injuries caused by defective products, however, the requirement of privity was narrowed and then eliminated, and the courts extended liability as far as social policy required (id., at 455-456). With these developments, it made little sense to think in terms of the buyer's bargain or expectations. In many, if not most, cases the buyer was not litigating.
By contrast, the standard usually employed to determine design defectiveness in strict products liability claims requires a balancing of the risks attendant on using the product with the utility of the product when used as intended. As we stated in Robinson v Reed-Prentice Div. of Package Mach. Co. (49 N.Y.2d 471, 479): "Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed. This rule, however, is tempered by the realization that some products, for example knives, must by their very nature be dangerous in order to be functional. Thus, a defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce" (see also, Voss v Black & Decker Mfg. Co., 59 N.Y.2d 102, 107-108; Rainbow v Elia Bldg. Co., 79 AD2d 287, 291, affd 56 N.Y.2d 550).
Although some jurisdictions have recognized the consumer expectation standard, or some variation of it, in tort litigation[*] New York has never done so and its utility for resolving claims of design defects has been widely criticized by commentators (see, Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 *270 Vand L Rev 593, 611-618 [1980]; Kennedy, The Role of the Consumer Expectation Test under Louisiana's Products Liability Tort Doctrine, 69 Tul L Rev 117, 143-150; Fischer, Products Liability  The Meaning of Defect, 39 Mo L Rev 339, 348-350 [1974]; and see, authorities cited in 5 Harper, James and Gray, Torts § 28.32A, at 576). They contend that the test is ambiguous because it does not clearly refer to the expectations of the actual plaintiff or to those of ordinary consumers; in practice it has been applied inconsistently and, from a social policy standpoint, it produces bad results.
If the test is applied to determine the actual buyer's expectations, as in contract law, it can result in imposing absolute liability upon manufacturers and sellers making them insurers of the product's safety merely because the product did not live up to the consumer's subjective expectations. If the test is used objectively, it is beyond the experience of most lay jurors to determine what an "ordinary consumer" expects or "how safe" a sophisticated modern product could or should be made to satisfy those expectations unless the jury is allowed to consider the cost or impracticality of alternative designs or, indeed whether any alternative design for the product was available.
The test can also produce bad results. For example, if the risk is one that is easily understood and appreciated by the average consumer, the manufacturer might not be liable even if the defect could be eliminated by available and inexpensive design changes. Conversely, if the defect was not apparent, liability might attach even if the product was in fact state of the art.
Moreover, the consumer expectation test is unworkable when applied in cases involving design defects. In claims involving manufacturing defects, a consumer may reasonably expect a product to be made in accordance with the manufacturer's standards and expect to be compensated for injuries resulting from the manufacturer's failure to meet them. The product is reasonably held defective because the manufacturer has not made the product as it intended. However, in design defect cases the plaintiff contends that the product has been made precisely as intended but is nevertheless defective because the design is defective. But unless some external standard, such as available alternative designs and risk/utility analysis is employed, how is the jury to measure the propriety of the design? The consumer cannot reasonably expect a design to be changed if the cost of doing so far outweighs the utility of the product or if there is no alternative design available. Some *271 products are inherently dangerous, knives was the illustration we used in the Robinson case (supra), and when that is so, policy concerns mandate that the responsibility for risks that cannot reasonably be designed out of a product should be transferred to the consumer, the party who has the choice of using them or not. (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 2, comment a, at 16.) The method for determining just what products fall within that group is the risk/utility analysis.
Because of these and other shortcomings, one commentator has stated that, when it comes to measuring defectiveness, the consumer expectation test applied without a risk/utility analysis is "a blunt instrument" (Kennedy, op. cit., at 150). Few courts have relied solely on it as a measure of defectiveness (see, Birnbaum, op. cit., at 615).
No New York court has recognized the consumer expectation standard to determine defectiveness in personal injury actions grounded on implied warranty  at least the parties and the majority have not cited any decision doing so  and I can see no persuasive policy reasons why we should do so now. If the test is unworkable when applied in tort causes of action grounded on strict products liability, it is equally unworkable when applied in tort causes of action grounded on breach of implied warranty. The correct standard in strict liability claims, according to the Third Restatement, should include a balancing of the risk of danger against the utility of the product as designed. In its words, "consumer expectations do not constitute an independent standard for judging the defectiveness of product designs" (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 2, comment f, at 29). They are "not determinative of defectiveness" because they do not take into account "whether the proposed alternative design could be implemented at reasonable cost, or whether an alternative design would provide greater overall safety", i.e., the test does not take into consideration risk/utility factors (id.). Consumer expectations only value is when used as a factor in determining the reasonableness of alternative designs or how the product is portrayed and perceived by the public, i.e., whether the risk was foreseeable. As we stated in Robinson v Reed-Prentice Div. of Package Mach. Co. (supra) the conditions contemplated by "the ultimate consumer" must be taken into account, but the risk/utility analysis remains a necessary part of the equation for determining defectiveness in products liability cases (Restatement [Third] of Torts, op. cit.; see also, Birnbaum, op. cit., at 617).

*272 III
The majority maintains, however, that the consumer expectation standard must be applied because breach of implied warranty is a statutory cause of action and the Court is not free to ignore the statute's provisions or draw a distinction between its application to commercial claims and personal injury claims.
Implied warranties have been a part of our statutory law since at least 1911, long before any serious attempt was made to base tort liability on them (see, former Personal Property Law § 96, now UCC 2-314). Section 96, and its successor provisions in the Uniform Commercial Code, were enacted to address problems arising in commercial transactions. For many years they had no significant impact upon personal injury litigation because of the rules of privity. However, in 1975, shortly after Codling v Paglia (supra) was decided, section 2-318 of the Uniform Commercial Code was amended to harmonize it with existing case law by eliminating the requirement of privity in personal injury claims (see, 1975 NY Legis Ann, at 110; Heller v U. S. Suzuki Motor Corp., 64 N.Y.2d 407, 411, supra). The amendment had no relevance to commercial claims; it was proposed by the Legislature, and widely supported, because it acknowledged and encouraged the judicial development of a separate category of warranty providing a tort remedy for personal injuries (see, 1975 NY Legis Ann, at 110; see also, Bill Jacket, L 1975, ch 774, Mem of State Consumer Protection Board, July 14, 1975; Mem of NY Law Rev Commn, Staff Notes Relating to A-3070; Mem of New York State Trial Lawyers Assn, May 12, 1975). The Legislature's recognition of a distinction between the statutory cause of action for personal injury claims and commercial claims based on implied warranty is further manifested by the Legislature's decision to adopt alternative B of the three formulations proposed by the National Conference of the Commissioners on Uniform State Laws, the alternative which removed the requirement of privity in personal injury claims based upon implied warranty, rather than alternative C which extends the rule (abolishing privity) to warranty claims other than those dealing with injuries to the person (see, 1A ULA 558 [Master ed], UCC 2-318, Official Comment 3).
Moreover, no words in the statute either before or after the amendment, provide that the defectiveness of the product in tort claims, or commercial claims for that matter, is to be measured by the consumer's expectations. That standard has been *273 developed by the courts. It may accurately assess the terms and conditions of the bargain between the parties to a sale but it can hardly extend beyond them to address defectiveness in the sense that something is "wrong" with the product. The thing "wrong" with the product in the consumer expectation test is that it has not lived up to the consumer's expectations and this is so even if the design of the product is perfection itself. The standard may retain some vitality when applied to commercial transactions but its individualized concept of injury is entirely foreign to tort doctrine underlying this area of law which is based upon the broad concept of enterprise responsibility to protect the public at large from harm.
Moreover, the statutory formulation of implied warranty has never restricted us in developing the tort remedy before. Long before the statute eliminated the requirement of privity for recovery, the courts narrowed and then eliminated it altogether. We did not feel inhibited by the statute in doing so: policy, not language, controlled the interpretation and application of the statute. Nor have the courts been constrained by the statute's provisions when eliminating the UCC's requirement of notice in tort actions (see, Fischer v Mead Johnson Labs., 41 AD2d 737; Kennedy v Woolworth Co., 205 App Div 648) or when shaping the law of disclaimers to apply them neutrally to personal injury cases (see, Velez v Craine & Clark Lbr. Corp., supra; see also, Walsh v Ford Motor Co., 59 Misc 2d 241; see also, 5 Harper, James and Gray, Torts § 28.25 [2d ed]).
The warranty claim in this case was for tortious personal injury and rests on the underlying "social concern [for] the protection of human life and property, not regularity in commercial exchange" (see, Restatement [Third] of Torts, op. cit., § 2, comment q, at 46). As such, it should be governed by tort rules, not contract rules. Nothing has prevented us in the past from construing and applying the provisions of the Uniform Commercial Code to supplement and advance the policy concerns underlying strict products liability generally, and we should not construe the statute now to establish a standard for determining defectiveness which is inconsistent with the present law in this area (see generally, UCC 1-103).
Accordingly, I dissent.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question No. 1 answered in the negative, certified question No. 2 answered in the negative, and certified question No. 3 answered in the affirmative.
NOTES
[1] Plaintiffs' cause of action for negligence was also submitted to the jury. The claim was rejected on proximate cause grounds, and its disposition is not now in issue.
[2] Indeed, the statutory provision for personal injury recovery as an element of "consequential damages" (UCC 2-715 [2] [b]) makes it illogical to conclude, as the amicus Product Liability Advisory Council suggests, that the breach of implied warranty theory should be confined to recovery for economic loss (see generally, Bocre Leasing Corp. v General Motors Corp., 84 N.Y.2d 685; Bellevue S. Assocs. v HRH Constr. Corp., 78 N.Y.2d 282; Schiavone Constr. Co. v Elgood Mayo Corp., 56 N.Y.2d 667, revg on dissent below 81 AD2d 221, 227).
[3] In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way. In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process. In the latter class of cases, the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault (see generally, Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand L Rev 593, 599-600).
[4] A warranty of fitness for ordinary purposes "does not mean that the product will fulfill [a] buyer's every expectation" (1 White and Summers, Uniform Commercial Code § 9-8, at 476 [Practitioner's 3d ed]). Rather, it has been observed, such a warranty "provides for a minimal level of quality" (Skelton v General Motors Corp., 500 F Supp 1181, 1191, revd on other grounds 660 F.2d 311).
[5] Significantly, the Model Act itself has been the subject of criticism (see, 1 Frumer and Friedman, op. cit., § 1.08 [2], at 1-164  1-165; Twerski and Weinstein, A Critique of the Uniform Product Liability Law  a Rush to Judgment, 28 Drake L Rev 221).
[6] The authors note that "[t]he fear that almost any defective product claim will pass under the rubric of consumer expectations can be dealt with by requiring that such expectations must be clearly and widely perceived to be attendant to the normal use of the product" (Twerski and Weinstein, op. cit., at 232).
[7] The dissent's first argument (dissenting opn, at 265-266) focuses on whether the District Court's charge to the jury on the question of "defect" created a basis for that jury to reach different conclusions on the design-defect and breach of implied warranty causes of action. However, matters such as the proper construction of a Federal court's charge as given and the reconcilability of a jury verdict under that charge are not "questions of New York law" and are therefore not properly before us here (see, NY Const, art VI, § 3 [b] [9]; see also, 22 NYCRR 500.17).
[*] See, e.g., Barker v Lull Eng'g Co., 20 Cal 3d 413, 573 P2d 443; Caterpillar Tractor Co. v Beck, 593 P2d 871 (Alaska); and see generally, Saratoga Fishing Co. v Marco Seattle, 69 F.3d 1432.