Frank CACCIOLA, Plaintiff,

v.

SELCO BALERS, INC., John Doe, Inc., the Harris Waste Management Group, Inc., Defendants.

No. 98 CV 4251(ILG).

United States District Court, E.D. New York.

Jan. 2, 2001.

178

Elliott Katz, Lerman & Katz, New York City.

William Vita, Garden City, NY.

*Memorandum & Order*

GLASSER, District Judge.

Plaintiff brings this negligence and strict products liability action seeking compensation for injuries he allegedly suffered while operating a baler manufactured by defendant Selco Balers, Inc. Defendant Harris Waste Management Group has moved to exclude certain expert testimony, and also for summary judgment. For the reasons that follow, defendant's motions are granted.

## BACKGROUND

Plaintiff Frank Cacciola was injured while operating a baler, a hydraulic machine used to compact cardboard boxes. The injury occurred at approximately 4:15 p.m. on December 3, 1996, during plaintiff's seventeenth year working as a bottler at a Pepsi Cola plant in Brooklyn. Plaintiff was injured when he inserted a box, measuring 40 inches in length and 50 inches in width, into the baler's compaction chamber. The baler was acquired by plaintiff's employer in the early 1990's and was equipped with an interlock device that powered a safety gate which, when closed, blocked access to the interior of the baler. The interlock switch was located on the machine at a height of nine feet from the floor. At the time plaintiff was using the baler, it is undisputed that the safety interlock switch had been disabled with wire, causing the baler to behave as though the safety gate were in the closed position and permitting access into the compaction chamber. The accident occurred when plaintiff's right forearm was caught underneath the baler's ram or "platen," a piece of steel that compresses material placed inside the compaction chamber.

On the day of his accident, plaintiff was familiar with the operation of the baler, as he had used it between 50 to 75 times. (Cacciola Dep., Pl.Ex. A at 16–18) Though he purportedly believed that the machine would only start with the safety gate in the closed position, plaintiff acknowledges hav-

ing pushed the machine's start button with the safety gate in the open or "up" position. (*Id.* at 15, 22, 23, 38) After pushing the start button, plaintiff heard the noise that the machine typically makes when it begins to operate. (*Id.* at 41) Plaintiff nonetheless inserted his arm into the baler's compaction chamber, only realizing that the platen was descending into the chamber when he began to feel pain in his arm. (*Id.* at 42, 43)

Plaintiff acknowledges that on the day of his accident, and indeed for as long as he could remember, a sign (which he acknowledges he understood) was displayed prominently on the baler warning employees to: "Stand Clear. Keep all body parts out of the machine during operation." (*Id.* at 68–70) It also is undisputed that plaintiff himself remembers a sign on the machine that cautioned: "Under no circumstances must safety switches be bypassed under this machine." [1] (*Id.* at 71, 72) However, Robert Furey, a Pepsi foreman who inspected the baler on the day of plaintiff's accident, did not recall seeing the following warning sign until after the accident. (Furey Dep., Def. Ex. H at 18–19) Plaintiff acknowledges, moreover, having read memoranda concerning safety issues that were distributed by at least one of his supervisors, plant manager Ron Kimmey. (Cacciola Dep. at 66) [2]

Plaintiff filed this action against Selco Balers, Inc., John Doe, Inc., and Harris Waste Management Group, Inc. (hereinafter "Harris"). Because Selco Balers is an unincorporated trade name used by Harris, not a separate corporate entity (Vita Aff. ¶ 1), Harris is the only defendant with which the court need be concerned in deciding this motion.[3] Plaintiff's complaint sounds in strict products liability and negligence. Plaintiff first asserts that Harris failed to use reasonable care in designing and manufacturing a baler with an easily modifiable safety device. Plaintiff contends, moreover, that Harris breached its duty to warn operators of the dangers of bypassing the baler's safety switch. Finally, plaintiff alleges that defendant failed to use a safer design alternative for the baler, in which the interlock device would not be bypassed as easily as it was here.

Defendant Harris now moves for summary judgment on all of plaintiff's claims pursuant to Fed.R.Civ.P. 56(c), arguing that, as a matter of law, a manufacturer cannot be held liable for injuries caused when the product in question has been substantially modified or altered. Defendant further moves to exclude a report prepared by plaintiff's expert, on the grounds that the report is inadmissible under Fed.R.Evid. 702. For the reasons stated below, defendant's motion to exclude expert testimony and motion for summary judgment should be granted.

### DISCUSSION

### I. *Defendant's Motion to Exclude Expert Testimony*

■■■ Defendant moves to exclude the testimony of plaintiff's expert, Thomas O'Donnell. This court has recently had occasion to address this issue in *Borgog-*

---

1. Despite plaintiff's testimony in a deposition that he recalled seeing this warning sign on the afternoon of his accident, this recollection is conspicuously absent from plaintiff's Local Rule 56.1 statement, which instead refers only to Furey's deposition testimony that this sign was not on the baler that day and was placed there at some point after plaintiff's accident.

2. While the safety memoranda allegedly distributed to plaintiff by Ron Kimmey were not included by either party with its moving papers, it seems that at least one such memorandum, which addressed bypassing of the baler interlocks, was provided to defendant's expert, James Vigani, for use in a report. (Vigani Rep., Def.'s Ex. J, at 1)

3. As for plaintiff's allegations with respect to the Doe defendant, the Verified Complaint alleges that John Doe, Inc. sold, maintained, installed, repaired, inspected and/or supervised machines within New York. (Verified Compl., ¶¶ 4, 5, 40–46, 67, 98–102) Plaintiff further alleges that the Doe defendant was negligent and reckless in its performance of these activities. (*Id.* at ¶¶ 45, 103)

none v. Trump Plaza, 2000 WL 341135 (E.D.N.Y. March 9, 2000), and the consideration of it discussed there is fully applicable here and was as follows: · It is appropriate for a district court to decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997). This is so because on a summary judgment motion, a "district court properly considers only evidence that would be admissible at trial." *Nora Beverages v. Perrier Group of America*, 164 F.3d 736, 746 (2d Cir.1998). Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion. If a proffer of expert testimony in the form of an expert report is excluded as inadmissible under Rule 702, the summary judgment determination is made on a record that does not include that evidence. *Raskin*, 125 F.3d at 66–67.

## A. Admissibility of Expert Testimony under Rule 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Supreme Court has characterized the admissibility standard under Rule 702 as imposing a two-fold task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In applying this standard, "the district court functions as the gatekeeper for expert testimony." *Raskin*, 125 F.3d at 66. A dis-

trict court should be particularly mindful of the relevance standard articulated by *Daubert*: "[e]xpert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. The Court also has recently held that Rule 702 extends to expert testimony based on technical or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

▪ In *Daubert*, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (i) whether the theory or technique relied on has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation in the case of a particular scientific technique; and (iv) whether the theory or method has been generally accepted by the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. In *Kumho Tire*, the Court emphasized that this list is non-exclusive, and its application must be flexible—particularly where, as here, the proffered testimony is based on "technical" or "other specialized" (rather than "scientific") knowledge. *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167.

▪ Expert engineering testimony may rest on scientific foundations, the examination of which invokes the *Daubert* factors directly, but may also rest on the personal knowledge or experience of the engineer. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. In the latter cases, the *Daubert* factors may nevertheless be useful in the assessment of reliability. It may, for example, be appropriate for the trial judge to ask "how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the rele-

vant engineering community." *Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167.

## B. *Admissibility of O'Donnell's Proffered Testimony*

■ Plaintiff's expert O'Donnell has a Ph.D. in mechanical engineering, and is licensed as a professional engineer in Pennsylvania. (O'Donnell Dep., Pl.'s Ex. E, at 4–5, 18) He has no professional experience with baler machines (*id.* at 17), nor does his past work experience suggest that he has had any significant experience with interlock switches. (*Id.* at 6–10) There is no suggestion that he was ever qualified as an expert in any state or federal court, although he has served as an expert consultant to litigants in several cases. (*Id.* at 13–17 and Pl.'s Ex. F) He has never previously served as an expert consultant in a case involving a baler machine. In its capacity as a gate-keeper regarding the admissibility of expert testimony, the Court is urged to preclude O'Donnell from testifying.

Before turning to the opinion to which the plaintiff would have him testify at trial and the factors upon which that opinion is based, it should be noted that O'Donnell has never physically examined the machine in question. He never interviewed Mr. Cacciola, relying only upon his deposition. (*See* Pl.'s Ex. G, Investigation of Baler Machine Accident, 2). In addition to the materials to which he referred cited there, he also referred to photographs of the machine. (*Id.* at 19–20).

The conclusions reached are stated on p. 6 of his report, Pl.'s Ex. G and are as follows:

1. The interlock switch designed to prevent the machine to operate when the safety gate is open was bypassed by a piece of baling wire by an unknown person.

2. The design of the baler safety gate interlock is not adequate for its intended function.

3. The interlock does not meet the requirements of OSHA. In the as-sold condition, the baler machine effectively has no safety interlock for prevention of platen motion when the safety gate is open.

4. The interlock was not designed to industry standards at the time of fabrication. Similar balers offered by competitors include a more tamper-resistant interlock.

5. The interlock does not satisfy ANSI requirements. The interlock is easily bypassed with readily available baling wire.

6. The lack of an adequate safety gate interlock as defined by National and International Codes and Standards, was the cause of Mr. Cacciola's accident.

An examination of O'Donnell's report and his deposition testimony is revealing and drives this Court to conclude that the motion to preclude him from testifying as an expert must be granted.

That conclusion becomes inescapable upon an examination of the bases upon which his opinion was formed.

● **The design of the safety gate interlock is not adequate for its intended function.**

His report and his testimony are entirely inconsistent with that statement. In his report he writes:

Above the baler door is a sliding safety gate which when opened provides access to the inside of the machine. The safety gate is opened by sliding it upward. Boxes and cartons can then be loaded into the machine. Once the baler is filled, the gate is closed and compaction initiated . . . .

To prevent activation of the platen while the safety gate is open, and to prevent opening the safety gate while the platen is in motion, safety interlocks are used. The interlocks are mechanically activated electric switches. The state of these switches is changed when the gate is moved so that opening circuits can be appropriately energized or de-energized.

The safety interlock switch ... on the Selco baler machine, intended to prevent actuation of the crushing platen when the safety gate is open, was over-ridden on the day of Mr. Cacciola's accident. The switch is located at the top right corner of the unit and is normally triggered by the vertical motion of the right side safety gate counterweight. As the gate is lowered, the counterweight is raised. When the gate is fully lowered, the weight contacts the switch lever and raises it, changing the state of the switch. [The] switch ... is configured as normally open (current cannot pass through the switch) when the gate is fully closed (lowered).

(Pl.'s Ex. G, 3; *see also* O'Donnell Dep., 23–24)

His report and his testimony describe a safety gate interlock switch that, as manufactured and at the time sold, was precisely designed for its intended function and, had it not been by-passed, would have prevented the plaintiff's injury. In this regard, his deposition testimony was as follows:

Q: Mr. O'Donnell, if the safety interlock switch on this baler had not been overridden at the time of the accident and the front gate had been fully closed, would you agree that this accident could not have occurred?

A: Well, there's really two parts to that. One is the statement that if the safety interlock was not overridden. The safety interlock could have been malfunctioning. So if you want to separate those out as two separate issues.

Q: Okay. Let's assume that the safety interlock switch was functioning properly and had not been overridden and the front safety gate was in the fully closed position. Assuming those two things, could this accident have occurred as it did:

A: No.

(O'Donnell Dep., 35:14–36:9)

• **The interlock does not meet the requirement of OSHA. This conclusory**

statement implicates his other conclusion that: **"The interlock does not satisfy ANSI requirements. The interlock is easily bypassed with readily available baling wire."**

O'Donnell's conclusion that the requirement of OSHA is not met is derived from an OSHA Regulation to which he refers and sets out at pages 4–5 of his Report and which provides in relevant part that: "Workers should not be able to easily remove or tamper with the safeguard because a safeguard that can easily be made ineffective is no safeguard at all."

O'Donnell's conclusion is predicated upon the implicit assumption that the safeguard at issue here is easily removed or tampered with which his deposition testimony completely belies. That testimony was as follows:

Q: It's my understanding from reading your report that it is your opinion that the interlock safety switch on this machine, the machine we're talking about today, is too easily accessible, is that right?

A: That is correct.

Q: How do you draw the parameters on too easily accessible?

A: Well, of course, that can be a somewhat gray area, but I think you can use what we call an engineering rule of thumb and that is that the device or switch should not be accessible without significant effort on the part of those who would wish to access it, in other words, you need tools, you need to take other things apart first, and I would also add that, when you're designing these things, you should certainly not design them so that they can be overridden with something that's readily available right there on the site, in this particular instance the baling wire. That's all that was really needed to override the switch. If you needed tools, screwdrivers, jumper wires, things like that, that is something that becomes a more formidable situation and is something that is more

desirable in terms of one of these switches.

So the bottom line is that you really can't make anything tamperproof. It's impossible. No matter what you put up there, if the right person comes along and has the right tools, equipment, et cetera, they're going to be able to override it. So all you can do is set it up so that it takes significant effort and tools, for instance, on the part of the person who wants to override it.

(O'Donnell Dep., 36:25–38:16)

That O'Donnell viewed his charge to be to find fault with this machine is reflected throughout his deposition testimony and is exemplified, by way of illustration, by the following excerpt.

Q. Assuming that the interlock safety switch is located over nine feet off the floor, it's your opinion that it is too easily accessible, is that right?

A. Yes, it is.

Q. If the switch was located ten feet off the floor, would that still be your opinion?

A. It doesn't matter how high off the floor the switch is located if there is a simple means to access it.

Q. Meaning if the safety switch was located 50 feet off the floor, in your view it would still be too easily accessible?

A. If there was a simple means to access the switch, yes.

(Pl.'s Ex. E, 46)

O'Donnell's "opinion" that the interlock does not satisfy ANSI requirements is puzzling in the light of his finding, on page 3 of his report, that: "The baler was built in accordance with American National Standards Institute, Inc. standard ANSI Z245.9."

● **The interlock was not designed to industry standards at the time of fabrication. Similar balers offered by competitors include a more tamper-resistant interlock.**

In his report, O'Donnell makes reference to the British Standard Code of Practice for Safety Machinery, but fails to cite any section of that Code. He also refers to the "European Community approach to the problem of tamper resistant interlocks" as being aimed at "minimizing the motivation for bypassing them and simultaneously making them difficult to defeat" without stating what that "approach" is. (Pl.'s Ex. G, 5)

His deposition testimony reveals his familiarity with only one other baler, the Piqua baler which he has never seen and didn't know how one gained access to the Piqua concealed safety switch.

Q. How does one gain access to the Piqua concealed safety switch?

A. I couldn't say for certain.

Q. Do you know if you need a screwdriver?

A. No. I don't know.

(O'Donnell Dep., 36)

Notwithstanding his acknowledged ignorance of those matters which are crucial to an informed judgment regarding the safety factors of the machine which is at issue here, and his acknowledgment that all safety switches, all interlock switches can be disabled if somebody really wants to do so (*id.* at 51–52), O'Donnell had no reluctance to express an opinion that the safety switch on the Piqua baler was not too easily accessible. (*Id.* at 40–41)

The portion of O'Donnell's deposition testimony set out above and indeed, the entirety of his deposition testimony compels the conclusion that the testimony sought to be elicited from him would not be "expert" or based on either technical or other specialized knowledge or experience as will assist the trier of fact to understand the evidence or to determine the fact in issue. The opinion which he would express rests upon unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation. "Nothing in either

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). It was precisely this kind of testimony, resting unreliably on a foundation of sand that *Daubert* and *Kumho* took aim at. On a prior occasion, preceding those cases by many years, this Court had occasion to write: "When expert witnesses become partisans, objectivity is sacrificed to the need to win. Testimony which is prompted by that need and that goal may deprive an injured plaintiff of the compensation that may be justly due him or wreak havoc upon the reputation and financial condition of the defendant." *Rubinstein v. Marsh*, 1987 WL 30608, \*7 (E.D.N.Y. Dec.10, 1987). That observation is peculiarly applicable here, and the motion to preclude the expert testimony is granted. O'Donnell's report therefore may not be considered as part of the record on defendant's motion for summary judgment.

## II. *Defendant's Summary Judgment Motion*

### A. *Governing Law*

 As an initial matter, this Court must determine the governing law in this diversity action presenting issues of strict products liability and common law negligence. In a diversity action, a district court looks to the choice-of-law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Jackson v. Domtar Indus., Inc.*, 35 F.3d 89, 92 (2d Cir.1994). In the tort context, New York courts apply an "interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001 (1994) (discussing the choice-of-law rules originally formulated in *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191

N.E.2d 279 (1963)). This interest analysis requires the court to determine whether the purpose of the legal standards at issue is to regulate conduct or to allocate losses, and to identify the significant contacts among the parties and the states involved. *Id.*

 Under *Babcock*'s choice-of-law analysis, rules of law that regulate conduct giving rise to a cause of action, such as the duty and standard of care applicable to manufacturers, are generally supplied by the place where the tort occurred because that state has "the greatest interest in regulating behavior within its borders." *Id.* In this case, plaintiff is a resident of New York. The accident occurred in New York and involved a machine manufactured by defendant Harris and sold to plaintiff's employer in New York sometime within the past ten years. While incorporated in Delaware with a principal place of business in Georgia, Harris conducts business in New York and is subject to jurisdiction here. There can be no doubt that, as between New York, Delaware and Georgia, New York has the greatest interest in regulating the conduct of manufacturers who sell machines that will be used by its citizens in factories that operate within its borders. It follows, therefore, that New York law governs the conduct that resulted in the accident at issue in this case.

### B. *Summary Judgment Standard*

Before examining the facts underlying this motion, it is important to recall the criteria by which a motion for summary judgment is determined. Summary judgment "shall be rendered forthwith if the pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of

her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a summary judgment motion, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co., Inc. v. U.S.,* 841 F.2d 469, 473 (2d Cir. 1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

### C. Elements of a Negligence Claim Under New York Law

 Under New York law, an action sounding in negligence against a manufacturer will lie where a plaintiff can show that the manufacturer was responsible for a defect that caused an injury, and that the manufacturer could have foreseen the injury. *Robinson v. Reed–Prentice Div. of Package Machinery Co.,* 49 N.Y.2d 471, 480, 403 N.E.2d 440, 426 N.Y.S.2d 717 (1980) (holding that manufacturer was not liable in negligence where it used reasonable care in designing a plastic molding machine). While it is clearly settled that a manufacturer has a duty to use reasonable care in designing a product, a defendant may only be held liable for violating that duty where the product has been "used in the manner for which the product was intended ... as well as [for] an unintended yet foreseeable use." *Id.* (internal citation omitted). A manufacturer's duty does not extend to designing a product that is impossible to abuse or one whose safety features may not be circumvented. *Robin-*

*son,* 49 N.Y.2d at 480–81, 426 N.Y.S.2d 717, 403 N.E.2d 440. Moreover, "a manufacturer need not incorporate safety features into its product so as to guarantee that no harm will come to every user no matter how careless or even reckless." *Id.* (citations omitted). Simply put, a manufacturer satisfies its duty under *Robinson* when the "product is marketed in a condition safe for the purposes for which it is intended or could reasonably be intended." *Id.* To require anything more of a manufacturer "would expand the scope of a manufacturer's duty beyond all reasonable bounds and would be tantamount to imposing absolute liability on manufacturers for all product-related injuries." *Id.* at 481, 426 N.Y.S.2d 717, 403 N.E.2d 440 (citation omitted).

### D. Elements of a Strict Products Liability Claim Under New York Law

 A cause of action in strict products liability under New York law will lie where a manufacturer places on the market a product which has a defect that causes injury. *Robinson,* 49 N.Y.2d at 478, 426 N.Y.S.2d 717, 403 N.E.2d 440 (holding that defendant was not strictly liable where safety gate on plastic molding machine was intact at the time of sale). A plaintiff may assert that a product is defective because of a defect in manufacturing or because of a design flaw, or because the manufacturer failed to provide adequate warnings regarding dangers associated with the product. *Fane v. Zimmer, Inc.,* 927 F.2d 124, 128 (2d Cir.1991) (citing *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 450 N.E.2d 204, 463 N.Y.S.2d 398 (1983)). Noteworthy for purposes of this motion, a manufacturer may not be held liable in strict products liability for a design defect where, after a product leaves the possession and control of a manufacturer, the product is subsequently modified so that it is both "substantially altered" and the "proximate cause" of plaintiff's injuries. *Robinson,* 49 N.Y.2d at 475, 426 N.Y.S.2d 717, 403 N.E.2d 440; *see also Frey v.*

*Rockford Safety Equipment Co.,* 154 A.D.2d 899, 546 N.Y.S.2d 54 (4th Dep't 1989). "Material alterations at the hands of a third party which work a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature, however foreseeable that modification may have been, are not within the ambit of a manufacturer's responsibility." *Robinson,* 49 N.Y.2d at 481, 426 N.Y.S.2d 717, 403 N.E.2d 440. At least one district court has applied *Robinson* to hold that the "disabling of [a] safety interlock switch by tying it up with a rag or piece of string is, as a matter of law, a substantial alteration[.]" *Kromer v. Beazer East, Inc.,* 826 F.Supp. 78, 81 (W.D.N.Y.1993).

■ Six years after *Robinson,* the New York Court of Appeals qualified the substantial modification defense in *Lopez v. Precision Papers, Inc.,* 107 A.D.2d 667, 669, 484 N.Y.S.2d 585 (2d Dept.1985), *aff'd,* 67 N.Y.2d 871, 492 N.E.2d 1214, 501 N.Y.S.2d 798 (1986). Plaintiff in *Lopez* was a forklift operator who was injured when a large roll of paper fell from a wooden pallet on a forklift he was operating from which the overhead safety guard was removed and struck him on the head. The record evidence reflected that the safety guard on the forklift had been purposefully designed to permit easy removal of the overhead guard and that the forklift had added versatility when operated without the guard. In light of this evidence, the court declined to apply the substantial modification rationale of *Robinson. Lopez,* 107 A.D.2d at 667, 484 N.Y.S.2d 585. The court held that because of the ease with which the overhead guard could be removed and the forklift's added versatility when operated without it, there was a legitimate jury question as to the scope of the forklift's intended purpose. *See also Rios v. Rockwell Int'l Corp.,* 268 A.D.2d 279, 280, 701 N.Y.S.2d 386, 387 (1st Dept. 2000) (holding that the removal of a safety guard that "was designed to be removed from the [printing] press with relative ease

to facilitate periodic press maintenance" did not constitute material alteration and that triable issue of fact existed as to whether such a printing press was reasonably safe for its intended use). Thus, under the *Lopez* qualification of *Robinson,* there is a triable issue of fact as to a design flaw when a product's safety device is designed to be easily removed or bypassed for a specific purpose.

■ In addition to a strict liability theory based on design flaws, a manufacturer also may be strictly liable if it fails to warn purchasers of the particular dangers a product may present. In yet another qualification to *Robinson,* the Court of Appeals in *Cover v. Cohen,* 61 N.Y.2d 261, 274–75, 461 N.E.2d 864, 871, 473 N.Y.S.2d 378, 385 (1984), concluded that a manufacturer can be liable on a failure to warn theory even after the product is sold based on "dangers in the use of a product which come to his attention after manufacture or sale, through advancements in the state of the art with which he is expected to stay abreast, or through being made aware of later accidents involving dangers in the product of which warning should be given to users." *Cover* remanded to the trial court the issue of whether an automobile manufacturer was liable insofar as it was aware of, but failed to take action on, accidents involving dangerous defects in the automobiles it previously had sold.

■ While it is fairly well-settled that a plaintiff may not recover based on the allegedly flawed design of a product that has been substantially modified (unless he is able to prove that the product was designed to permit its use as modified), recovery is not always precluded where a plaintiff attempts to hold liable the manufacturer of a product that was substantially modified under a failure to warn theory. In *Liriano v. Hobart Corp.,* 132 F.3d 124, 128 (2d Cir.1998), the Second Circuit recognized that although *Robinson* squarely held that a manufacturer may not be liable (either in strict products liability or negligence) on a design defect claim caused by

modification of a safety device, New York case law was less clear on whether a manufacturer is liable (either in strict products liability or negligence) for *failure to warn* of the dangers of misusing the product following such modification. At issue in *Liriano* was a manufacturer's liability for failure to warn of the dangers of operating a meat grinder from which the safety guard has been removed. In light of the different results reached by New York courts on that issue, the Second Circuit in *Liriano* deferred judgment, certifying the question to the New York Court of Appeals.[4]

In 1998, the New York Court of Appeals answered the certified question, holding that "manufacturer liability for failure to warn may exist in cases where the substantial modification defense would preclude liability on a design defect theory." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 243, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998). Contrasting the role of a substantial modification in design flaw claim and a failure to warn claim, the court noted: "The factors militating against imposing a duty to design against foreseeable post-sale product modifications are either not present or less cogent with respect to a duty to warn against making such modifications ... [A]lthough it is virtually impos-

sible to design a product to forestall all future risk-enhancing modifications that could occur after the sale, it is neither infeasible nor onerous, in some cases, to warn of the dangers of foreseeable modifications that pose the risk of injury." *Id.* at 239–40, 677 N.Y.S.2d 764, 700 N.E.2d 303.

The court was careful to impose limitations upon the reach of its decision by emphasizing:

> that a safety device built into the integrated final product is often the most effective way to communicate that operation of the product without the device is hazardous. Thus, where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger.... Thus, in appropriate cases, courts could as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury.

---

4. Prior to 1998, at least three appellate division courts had distinguished a failure to warn claim from a design defect claim in the context of a substantial modification defense. *See Darsan v. Guncalito Corp.*, 153 A.D.2d 868, 545 N.Y.S.2d 594 (2d Dep't 1989) (applying substantial modification defense of *Robinson* to design defect claim but sustaining complaint insofar as it was based on theory that a meat grinder was defective by virtue of the failure to display prominent warnings of the danger of using the machine without the safety guard in place); *Miller v. Anetsberger Bros.*, 124 A.D.2d 1057, 1059, 508 N.Y.S.2d 954 (4th Dep't 1986) (distinguishing failure to warn claim in the context of a substantial modification defense and holding that defendant failed to warn users of the dangers of cleaning a pizza dough roller while it was operating without the safety panels, despite its knowledge that "users were cleaning the rollers with the machine operating, and the conve-

nience of doing so"); *Smith v. Royce W. Day Co.*, 242 A.D.2d 394, 661 N.Y.S.2d 101, 103 (3d Dep't 1997) (declining to extend *Robinson*'s substantial modification defense to plaintiff's claim that a manufacturer failed to provide explicit warnings that a forklift was not to be used without the original platform).

In contrast, other courts had held that, when a product is substantially modified after it is delivered, a plaintiff is precluded from successfully pressing both design defect and failure to warn claims. *See e.g., Kromer v. Beazer East, Inc.*, 826 F.Supp. 78, 81 (W.D.N.Y.1993) (according same treatment to defendant's substantial modification defense for purposes of design defect and failure to warn theories of strict product liability); *Ernest v. S.M.S. Eng'g Inc.*, 223 A.D.2d 801, 803, 635 N.Y.S.2d 799, 801 (3d Dep't 1996) (same); *Frey v. Rockford Safety Equip. Co.*, 154 A.D.2d 899, 899, 546 N.Y.S.2d 54, 55 (4th Dep't 1989) (same).

*Id.* at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303 (internal citations omitted).

Elaborating upon this last observation, the court went on to write:

> Where a danger is readily apparent as a matter of common sense, "there should be no liability for failing to warn someone of a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided".... Put differently, when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning. On the other hand, the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user.

*Id.* at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303 (internal citations omitted). The court concluded by emphasizing that liability for failure to warn "is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Id.* at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303.

Applying the holding of the New York Court of Appeals to *Liriano,* the Second Circuit then held that failure to warn liability was not unavailable to the plaintiff as a matter of law. Defendant had argued that a manufacturer had no duty to provide a warning when the dangers of using the (modified) meat grinder are obvious and when a plaintiff fails to introduce evidence of the causal connection between the failure to warn and his injury. *Liriano v. Hobart Corp.,* 170 F.3d 264, 271–72 (2d Cir.1999). The court noted, however, that while a jury could reasonably find that the danger of using a meat grinder was so obvious that no warnings were necessary, it would also be reasonable for a jury to conclude that warnings *were* necessary, in particular where machine operators, such as Liriano himself (who had only used the machine two or three times and was a recent immigrant to the United States) were unaware of the dangers of using a grinder without the safety device and where the cost of issuing warnings was sufficiently inexpensive that a reasonable manufacturer would have used, and indeed had a duty to use, them. *Id.* As for defendant's causation argument, the court concluded that plaintiff's failure to introduce detailed evidence of but-for causation did not bar his failure to warn claim where plaintiff had already established a "strong causal linkage" in his *prima facie* case. *Id.*

Critical for purposes of this motion is the fact that the meat grinder at issue in *Liriano* apparently had no warnings concerning removal of the safety guard. *See Liriano,* 132 F.3d at 125. In its opinion certifying the question of whether a manufacturer cannot be held liable, as a matter of law, for failure to warn in cases where the machine is substantially modified, the Second Circuit noted that "no warnings were placed on the machine or otherwise given to indicate that it was dangerous to operate the machine without the safety guard in place." *Id.* Again in its decision following the New York Court of Appeals' answer to the certified question, the Second Circuit noted that "the machine bore no warning indicating that the grinder should be operated only with a safety guard attached." *Liriano,* 170 F.3d at 266. Also uncontested in *Liriano* was the fact that the manufacturer "actually knew, before the accident, that removals of [the safety guard] were occurring and that use of the machine without the safety guard was highly dangerous." *Id.* (Subsequent to selling the grinder to plaintiff's employer in 1961, the manufacturer did become aware of the fact that a number of purchasers of its meat grinders had removed the safety guards and began issuing warnings on grinders in 1962. There is no suggestion that the manufacturer attempted to provide plaintiff's employer with any kind of warnings after it began issuing

warnings on its other grinders.) Read in the context of these facts, the various pronouncements in *Liriano* instruct that a manufacturer who issues *no* warnings concerning the danger of operation without a safety device is not absolved from liability for failure to warn as a matter of law simply because the machine was substantially modified through removal of the device. However, assuming the individual facts of a case, viewed most favorably to the plaintiff, involve a danger that "is readily apparent as a matter of common sense," *Liriano*, 92 N.Y.2d at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303, summary judgment in favor of the manufacturer may be appropriate.

### E. Issues Bearing on Defendant's Potential Liability in this Case

Having set forth the applicable standard, the court now turns to plaintiff's claims. Plaintiff contends that defendant is liable in negligence and strict products liability stemming from its flawed design of the Selco baler and its failure to warn of the dangers associated with using the baler with a bypassed interlock switch.

### 1. Negligence

■■■ The basis for plaintiff's negligence claim is that defendant's placement of a safety interlock switch slightly above nine feet from the ground rendered the switch too easily accessible. The only basis for plaintiff's assertion that the switch was *too easily* accessible is simply that it was modified. The logic of that assertion is bottomed upon a syllogism which is essentially as follows: Interlock switches should not be too easily accessible. This interlock switch was modified. Therefore it was too easily accessible. That logic is patently flawed for it would compel the conclusion that whenever and however an interlock switch is modified, it would be too accessible. The demands of the law have not yet reached that far. Moreover, nothing in the record suggests that defendant did not employ reasonable care in designing a bal-

er that was safe when used in the manner for which it was intended or was negligent in not foreseeing an unreasonable risk of harm where used in a manner for which it was not intended. By placing the safety interlock switch well out of reach of machine operators, defendant used the reasonable care required under *Robinson*. Finally, it is beyond cavil that the bypassing of the interlock switch was a material alteration that worked a substantial change in the condition of the baler at the time it was sold. Modification might have shortened the time it took to bale cardboard boxes, but, as in *Robinson*, it also destroyed the practical utility of the safety features incorporated into the design of the baler because it permitted access into the compaction chamber, which the safety feature was designed to prevent. *Robinson*, 49 N.Y.2d at 477, 426 N.Y.S.2d 717, 403 N.E.2d 440. For these reasons, the court concludes that plaintiff has failed to establish a basis for negligence on the part of defendant in the design of the Selco baler.

### 2. Strict products liability

■■■ The determination that defendant was not negligent with respect to the design of the baler essentially disposes of the defective design aspect of plaintiff's strict liability claim. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 255, 662 N.E.2d 730 (1995), *aff'd* 79 F.3d 12 (2d Cir.1996) (holding, in answering certified question, that: "In general ... the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing.") (citation omitted). As with plaintiff's negligence claim, the fact that the interlock switch on the baler was bypassed created a substantial modification that precludes plaintiff from establishing strict products liability on the basis of a design flaw. "[A] manufacturer of a product may not be held liable in a strict products liability or negligence cause of action where, after a product leaves pos-

session and control of the manufacturer, there is subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries." *Kromer v. Beazer East Inc.*, 826 F.Supp. 78, 80 (W.D.N.Y.1993) (citing *Robinson*).

Plaintiff argues at great length that the limitation of *Robinson*'s substantial modification defense in *Lopez* and *Rios* requires the court to deny summary judgment on his design defect claim. (Pl.'s Memo at 4–7) However, plaintiff has not asserted, nor can he, that the interlock switch was purposefully manufactured with a view to its being bypassed so as to render the baler unsafe to use, or to state it differently, that removability was part of the baler's design. *Lopez* and *Rios* are thus plainly distinguishable.

Plaintiff's defective design claim also is premised on an allegation that defendant failed to employ safer design alternatives that might have prevented plaintiff's injury. That allegation, however, ignores New York law that clearly provides that a defendant is not obligated to design a product that is impossible to "abuse or one whose safety features may not be circumvented[,]" *Robinson*, 49 N.Y.2d at 480–81, 426 N.Y.S.2d 717, 403 N.E.2d 440, and is thus without merit.

Nor can plaintiff establish liability for a design defect based on the fact that defendant became aware of a flaw in a machine's design subsequent to the manufacture or sale of the machine. Unlike in *Robinson*, 49 N.Y.2d at 478, 426 N.Y.S.2d 717, 403 N.E.2d 440 or *Miller v. Anetsberger*, 124 A.D.2d 1057, 1058, 508 N.Y.S.2d 954, 955 (4th Dep't 1986), the record in this matter contains no evidence or testimony that defendant either had observed or was notified that workers at Pepsi Cola, or indeed any others who owned the Selco baler, were using the machine with a disabled interlock switch. Moreover, even if the record did contain such evidence concerning defendant's knowledge, liability under a design flaw theory is precluded if, as

here, the defendant can show that the machine was substantially modified.

▪ In addition to advancing a defective design claim, plaintiff also seeks to impose strict liability based on defendant's failure to provide adequate warnings against the dangers associated with using the baler with the safety gate in the open position. As a preliminary matter, plaintiff's attempt to create a genuine issue of fact on his warnings claim is questionable, at best, considering plaintiff's own testimony in this matter. Despite his efforts to downplay his own recollection, plaintiff clearly testified that, on the day he was injured, he read and understood a sign on the baler that cautioned operators not to bypass safety switches. (Cacciola Dep., 71, 72) Even the court's obligation to view the evidence in the light most favorable to the nonmovant cannot justify the denial of summary judgment where the nonmovant's own testimony defeats his failure to warn claim.

Moreover, application of *Liriano*'s fact-specific inquiry to this case suggests that summary judgment is not precluded for two reasons: first, *Liriano* was predicated on a machine that had no warnings whatsoever concerning the importance of the safety device and, second, those factors in *Liriano* (including plaintiff's assumed lack of familiarity with the grinder) which suggest that a jury *could* have concluded that the dangers of modifying the meat grinder were not too obvious and thus require warnings are entirely absent here. It has already been established that in this case, unlike in *Liriano*, a warning sign *was* posted on the baler concerning the danger of bypassing the safety device, which plaintiff himself not only saw but understood. In addition, unlike plaintiff in *Liriano*—who was a recent immigrant with limited proficiency in English and hardly any experience or understanding of the meat grinder (*id.* at 269, 677 N.Y.S.2d 764, 700 N.E.2d 303)—plaintiff in this case had an acknowledged understanding of the baler's safety mechanism and extensive experi-

ence operating it. These facts together suggest that no jury could reasonably find that plaintiff had the type of knowledge, lacking in *Liriano*, of the danger of operating the baler without the safety device and that this danger therefore was "obvious" to him. While the presence in *Liriano* of a substantial modification was not enough to take the question of defendant's duty to warn away from the jury, plaintiff's acknowledgment here that a sign cautioning against bypassing the safety device *was* on the baler on the day of his injury and his extensive experience operating the baler not only distinguish this case from *Liriano* but justify summary judgment.

On reviewing the record, it is apparent that the circumstances culminating in plaintiff's injury do not stem from the baler's flawed design or from defendant's failure to warn, but rather from plaintiff's disregard of the operating procedures he admits having understood and the warning signs he acknowledges having seen on the baler. The fact that plaintiff suffered the consequences of what may have been a common practice at Pepsi does not justify imposing liability upon the defendant for these injuries, where nothing suggests that defendant was aware of that practice. As *Robinson* clearly counsels: "[T]hat an employee may have no remedy in tort against his employer gives the courts no license to thrust upon a third-party manufacturer a duty to insure that its product will not be abused or that its safety features will be callously altered by a purchaser." *Robinson*, 49 N.Y.2d at 481, 426 N.Y.S.2d 717, 403 N.E.2d 440 (citation omitted). Because the court finds that the baler at issue in this action was marketed in a condition safe for the purposes for which it was intended, that the subsequent bypassing of the interlock device was a substantial modification, and that defendant did not fail to warn of the dangers of using the machine without a safety device, summary judgment is appropriate both on plaintiff's design and failure to warn theories.[5]

---

5. It might persuasively be argued that to the extent that the court in *Liriano*, 170 F.3d at 270, seemingly placed significant reliance upon Hendersen & Twerski, *Doctrinal Collapse in Products Liability: The Empty Shelf of the Failure to Warn*, 65 N.Y.U.L.Rev. 265 (1990), its reliance was misplaced. Those authors were of the view that "nothing is to be gained by adding a warning of the danger already telegraphed by the product itself." 65 N.Y.U.L.Rev. at 282. But more to the point perhaps, in the context of this case, is the following excerpt from that article: "A plaintiff who does not legitimately establish a design case by qualified expert testimony should not be awarded an illegitimate failure-to-warn recovery as a consolation prize by a court's mislabeling of an obvious risk as non-obvious." *Id.* at 315. That Hendersen and Twerski would not support *Liriano*'s extension of informed-choice theory to cases such as this one is evident from their suggestion that liability for failure to provide informed-choice warnings has been "generally limited to prescription drugs and cosmetics, although occasionally other products are implicated." *Id.* at 286. In their Reporters' Note to the Restatement, the authors extol the wisdom of such a limitation when they note:

Comment *i* ["Inadequate instructions or warnings"] observes that judicial decisions supporting the duty to provide warnings for informed decision-making have arisen almost exclusively with regard to toxic agents and pharmaceutical products. Typically, once ingestion has taken place, consumers of these products are relatively passive and do not have an interactive relationship with the product. Case law has yet to expand the obligation to provide informed decision warnings to product risks in which the product-user relationship is more complex. For example, it would be onerous to impose a duty to warn about the relative degrees of crashworthiness of different models of automobiles. Such warnings would have to take into consideration such factors as speed, point of collision, use of seatbelts, and a myriad of other factors. If informed-decision warnings would necessarily be voluminous and incapable of consistent formulation, they would add little, if anything, to true informed choice.

Restatement of Torts: Products Liability, § 2, p. 96. Hendersen and Twerski are not alone in pointing out the perils of requiring detailed warnings for products other than prescription drugs. Echoing their concerns, others have made the following observation:

Cases finding a duty to provide a so-called "informed-choice warning" have generally been limited to prescription drugs and cosmetics, although occasionally other prod-

## CONCLUSION

For the reasons set forth above, defendant's motion to exclude expert testimony and motion for summary judgment are granted.

SO ORDERED.

ucts are implicated. Typical examples of these warnings in our society involve the warnings on inserts in prescription drugs which advise of the risk of side-effects, or the language sometimes found on cosmetics which note the possibility of allergic reactions. In contrast, the scenario in the Liriano case has none of the characteristics of the settings in which courts have found "informed choice" warnings appropriate. The case involves methods of keeping employees' hands out of operating meat grinders. That risk was neither latent nor unavoidable. On the contrary, the risk was obvious: Keep hands out of the grinder [or you will lose them]. If the worker was uncomfortable with his ability to keep his hands out of the grinder given its configuration, he had the option (if he had any options at all [to keeping his job] ) of declining to use the grinder. Thus, every purpose of the "informed-choice" warning is served-the user is aware of the risk, and can avoid it by careful use of the product, or by declining to use the product at all.

Bowbeer & Killoran, *Liriano v. Hobart Corp.; Obvious Dangers, The Duty to Warn of Safer Alternatives, and the Heeding Presumption*, 65 Brook. L.Rev. 717, 749 (1999) (citing 65 N.Y.U.L.Rev. at 286).